## UNITED STATES v. ALUMINUM CO. OF AMERICA et al.
### No. 144.

Circuit Court of Appeals, Second Circuit.
March 12, 1945.

418

Charles Fahy, Sol. Gen., of Washington, D. C., and Lawrence S. Apsey, of New York City (Norman A. Adler, of New York City, Edward S. Stimson, Robert L. Stern, and Aute L. Carr, all of Washington, D. C., Jesse R. O'Malley, of Cincinnati, Ohio, Marcus A. Hollabaugh, of Washington, D. C., Maurice Godin, of New York City, and Irving Lipkowitz, of Washington, D. C., on the brief), for appellant.

William Watson Smith, of Pittsburgh, Pa. (Frank B. Ingersoll and Leon E. Hickman, both of Pittsburgh, Pa., and Charles E. Hughes, Jr., and William T. Gossett, both of New York City, on the brief), for appellees Aluminum Co. of America and others.

Timothy N. Pfeiffer, of New York City (Morris Hadley, Rebecca M. Cutler, and Rudolph B. Schlesinger, all of New York City, on the brief), for appellees Aluminum Limited and others.

A. L. Nash, of Manitowoc, Wis., and Roger S. Baldwin and E. Raymond Shephard, both of New York City, for Aluminum Goods Mfg. Co.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

## L. HAND, Circuit Judge.

This appeal comes to us by virtue of a certificate of the Supreme Court, under the amendment of 1944 to § 29 of 15 U.S. C.A. The action was brought under § 4 of that title, praying the district court to adjudge that the defendant, Aluminum Company of America, was monopolizing interstate and foreign commerce, particularly in the manufacture and sale of "virgin" aluminum ingot, and that it be dissolved; and further to adjudge that that company and the defendant, Aluminum Limited, had entered into a conspiracy in restraint of such commerce. It also asked incidental relief. The plaintiff filed its complaint on April 23, 1937, naming sixty-three defendants: ten of these were not served and did not appear; one died, and one corporate defendant was dissolved before the action was brought: the complaint was dismissed against another. At the date of judgment there were fifty-one defendants who had been served and against whom the action was pending. We may divide these, as the district judge did, into four classes: Aluminum Company of America, with its wholly owned subsidiaries, directors, officers and shareholders. (For convenience we shall speak of these defendants collectively as "Alcoa," that being the name by which the company has become almost universally known.) Next, Aluminum Limited, with its directors, officers and shareholders. (For the same reason we shall speak of this group as "Limited.") Third: the defendant, Aluminum Manufactures, Inc., which may be treated as a subsidiary of "Alcoa." Fourth: the defendant, Aluminum Goods Manufacturing Company, which is independent of "Alcoa," as will appear. The action came to trial on June 1, 1938, and proceeded without much interruption until August 14, 1940, when the case was closed after more than 40,000 pages of testimony had been taken. The judge took time to consider the evidence, and delivered an oral opinion which occupied him from September 30, to October 9, 1941. Again he took time to prepare findings of fact and conclusions of law which he filed on July 14, 1942; and he entered final judgment dismissing the complaint on July 23rd, of that year. The petition for an appeal, and assignments of error, were filed on September 14, 1942, and the petition was allowed on the next day. On June 12, 1944, the Supreme Court, declaring that a quorum of six justices qualified to hear the case was wanting, referred the appeal to this court under § 29 of Title 15, already mentioned. The district judge's opinion, reported in D.C., 44 F.Supp. 97, discussed the evidence with the utmost particularity; it took up every phase and every issue with the arguments of both parties, and provided a reasoned basis for the subsequent findings of fact and conclusions of law. For the purposes of this appeal we need not repeat the greater part of the facts; so far as it is necessary, we do so, leaving acquaintance with the remainder to the opinion itself. Although the plaintiff challenged nearly all of the 407 findings of fact, with negligible exceptions these challenges were directed, not to misstatements of the evidence, but to the judge's inferences—alleged to be "clearly erroneous." For con-

venience we have divided our discussion into four parts: (1) whether "Alcoa" monopolized the market in "virgin" aluminum ingot; (2) whether "Alcoa" was guilty of various unlawful practices, ancillary to the establishment of its monopoly; (3) whether "Limited" and "Alcoa" were in an unlawful conspiracy; and whether, if not, "Limited" was guilty of a conspiracy with foreign producers; (4) what remedies are appropriate in the case of each defendant who may be found to have violated the Act.

## I.

"ALCOA'S MONOPOLY OF "VIRGIN" Ingot.

"Alcoa" is a corporation, organized under the laws of Pennsylvania on September 18, 1888; its original name, "Pittsburgh Reduction Company," was changed to its present one on January 1, 1907. It has always been engaged in the production and sale of "ingot" aluminum, and since 1895 also in the fabrication of the metal into many finished and semi-finished articles. It has proliferated into a great number of subsidiaries, created at various times between the years 1900 and 1929, as the business expanded. Aluminum is a chemical element; it is never found in a free state, being always in chemical combination with oxygen. One form of this combination is known as alumina; and for practical purposes the most available material from which alumina can be extracted is an ore, called, "bauxite." Aluminum was isolated as a metal more than a century ago, but not until about 1886 did it become commercially practicable to eliminate the oxygen, so that it could be exploited industrially. One, Hall, discovered a process by which this could be done in that year, and got a patent on April 2, 1889, which he assigned to "Alcoa," which thus secured a legal monopoly of the manufacture of the pure aluminum until on April 2, 1906, when this patent expired. Meanwhile Bradley had invented a process by which the smelting could be carried on without the use of external heat, as had theretofore been thought necessary; and for this improvement he too got a patent on February 2, 1892. Bradley's improvement resulted in great economy in manufacture, so that, although after April 2, 1906, anyone could manufacture aluminum by the Hall process, for practical purposes no one could compete with Bradley or with his licensees until February 2, 1909, when Bradley's patent also expired. On October 31, 1903, "Alcoa" and the assignee of the Bradley patent entered into a contract by which "Alcoa" was granted an exclusive license under that patent, in exchange for "Alcoa's" promise to sell to the assignee a stated amount of aluminum at a discount of ten per cent below "Alcoa's" published list price, and always to sell at a discount of five per cent greater than that which "Alcoa" gave to any other jobber. Thus until February 2, 1909, "Alcoa" had either a monopoly of the manufacture of "virgin" aluminum ingot, or the monopoly of a process which eliminated all competition.

The extraction of aluminum from alumina requires a very large amount of electrical energy, which is ordinarily, though not always, most cheaply obtained from water power. Beginning at least as early as 1895, "Alcoa" secured such power from several companies by contracts, containing in at least three instances, covenants binding the power companies not to sell or let power to anyone else for the manufacture of aluminum. "Alcoa"—either itself or by a subsidiary—also entered into four successive "cartels" with foreign manufacturers of aluminum by which, in exchange for certain limitations upon its import into foreign countries, it secured covenants from the foreign producers, either not to import into the United States at all, or to do so under restrictions, which in some cases involved the fixing of prices. These "cartels" and restrictive covenants and certain other practices were the subject of a suit filed by the United States against "Alcoa" on May 16, 1912, in which a decree was entered by consent on June 7, 1912, declaring several of these covenants unlawful and enjoining their performance; and also declaring invalid other restrictive covenants obtained before 1903 relating to the sale of alumina. ("Alcoa" failed at this time to inform the United States of several restrictive covenants in water-power contracts; its justification—which the judge accepted—being that they had been forgotten.) "Alcoa" did not begin to manufacture alumina on its own behalf until the expiration of a dominant patent in 1903. In that year it built a very large alumina plant at East St. Louis, where all of its alumina was made until 1939, when it opened another plant in Mobile, Alabama.

None of the foregoing facts are in dispute, and the most important question in the case is whether the monopoly in "Alcoa's" production of "virgin" ingot, secured

by the two patents until 1909, and in part perpetuated between 1909 and 1912 by the unlawful practices, forbidden by the decree of 1912, continued for the ensuing twenty-eight years; and whether, if it did, it was unlawful under § 2 of the Sherman Act, 15 U.S.C.A. § 2. It is undisputed that throughout this period "Alcoa" continued to be the single producer of "virgin" ingot in the United States; and the plaintiff argues that this without more was enough to make it an unlawful monopoly. It also takes an alternative position: that in any event during this period "Alcoa" consistently pursued unlawful exclusionary practices, which made its dominant position certainly unlawful, even though it would not have been, had it been retained only by "natural growth." Finally, it asserts that many of these practices were of themselves unlawful, as contracts in restraint of trade under § 1 of the Act, 15 U.S.C.A. § 1. "Alcoa's" position is that the fact that it alone continued to make "virgin" ingot in this country did not, and does not, give it a monopoly of the market; that it was always subject to the competition of imported "virgin" ingot, and of what is called "secondary" ingot; and that even if it had not been, its monopoly would not have been retained by unlawful means, but would have been the result of a growth which the Act does not forbid, even when it results in a monopoly. We shall first consider the amount and character of this competition; next, how far it established a monopoly; and finally, if it did, whether that monopoly was unlawful under § 2 of the Act.

From 1902 onward until 1928 "Alcoa" was making ingot in Canada through a wholly owned subsidiary; so much of this as it imported into the United States it is proper to include with what it produced here. In the year 1912 the sum of these two items represented nearly ninety-one per cent of the total amount of "virgin" ingot available for sale in this country. This percentage varied year by year up to and including 1938: in 1913 it was about seventy-two per cent; in 1921 about sixty-eight per cent; in 1922 about seventy-two; with these exceptions it was always over eighty per cent of the total and for the last five years 1934–1938 inclusive it averaged over ninety per cent. The effect of such a proportion of the production upon the market we reserve for the time being, for it will be necessary first to consider the na-

ture and uses of "secondary" ingot, the name by which the industry knows ingot made from aluminum scrap. This is of two sorts, though for our purposes it is not important to distinguish between them. One of these is the clippings and trimmings of "sheet" aluminum, when patterns are cut out of it, as a suit is cut from a bolt of cloth. The chemical composition of these is obviously the same as that of the "sheet" from which they come; and, although they are likely to accumulate dust or other dirt in the factory, this may be removed by well known processes. If a record of the original composition of the "sheet" has been preserved, this scrap may be remelted into new ingot, and used again for the same purpose. It is true that some of the witnesses—Arthur V. Davis, the chairman of the board of "Alcoa" among them—testified that at each remelting aluminum takes up some new oxygen which progressively deteriorates its quality for those uses in which purity is important; but other witnesses thought that it had become commercially feasible to remove this impurity, and the judge made no finding on the subject. Since the plaintiff has the burden of proof, we shall assume that there is no such deterioration. Nevertheless, there is an appreciable "sales resistance" even to this kind of scrap, and for some uses (airplanes and cables among them), fabricators absolutely insist upon "virgin": just why is not altogether clear. The other source of scrap is aluminum which has once been fabricated and the article, after being used, is discarded and sent to the junk heap..as for example, cooking utensils, like kettles and pans, and the pistons or crank cases of motorcars. These are made with a substantial alloy and to restore the metal to its original purity costs more than it is worth. However, if the alloy is known both in quality and amount, scrap, when remelted, can be used again for the same purpose as before. In spite of this, as in the case of clippings and trimmings, the industry will ordinarily not accept ingot so salvaged upon the same terms as "virgin." There are some seventeen companies which scavenge scrap of all sorts, clean it, remelt it, test it for its composition, make it into ingots and sell it regularly to the trade. There is in all these salvage operations some inevitable waste of actual material; not only does a certain amount of aluminum escape altogether, but in the salvaging process itself some is skimmed off as scum

and thrown away. The judge found that the return of fabricated products to the market as "secondary" varied from 'five to twenty-five years, depending upon the article; but he did not, and no doubt could not, find how many times the cycle could be repeated before the metal was finally used up.

■■ There are various ways of computing "Alcoa's" control of the aluminum market—as distinct from its production—depending upon what one regards as competing in that market. The judge figured its share—during the years 1929–1938, inclusive—as only about thirty-three per cent; to do so he included "secondary," and excluded that part of "Alcoa's own production which it fabricated and did not therefore sell as ingot. If, on the other hand, "Alcoa's" total production, fabricated and sold, be included, and balanced against the sum of imported "virgin" and "secondary," its share of the market was in the neighborhood of sixty-four per cent for that period. The percentage we have already mentioned—over ninety—results only if we both include all "Alcoa's" production and exclude "secondary". That percentage is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four per cent would be enough; and certainly thirty-three per cent is not. Hence it is necessary to settle what (he) shall treat as competing in the ingot market. That part of its production which "Alcoa" itself fabricates, does not of course ever reach the market as ingot; and we recognize that it is only when a restriction of production either inevitably affects prices, or is intended to do so, that it violates § 1 of the Act. Apex Hosiery Co. v. Leader, 310 U. S. 469, 501, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044. However, even though we were to assume that a monopoly is unlawful under § 2 only in case it controls prices, the ingot fabricated by "Alcoa," 'necessarily had a direct effect upon the ingot market. All ingot—with trifling exceptions— is used to fabricate intermediate, or end, products; and therefore all intermediate, or end, products which "Alcoa" fabricates and sells, pro tanto reduce the demand for ingot itself. The situation is the same, though reversed, as in Standard Oil Co. v. United States, 221 U.S. 1, 77, 31 S.Ct. 502, 523, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734, where the court answered the defendants' argument that they had no control over the crude oil by saying that "as substantial power over the crude product was the inevitable result of the absolute control which existed over the refined product, the monopolization of the one carried with it the power to control the other." We cannot therefore agree that the computation of the percentage of "Alcoa's" control over the ingot market should not include the whole of its ingot production.

As to "secondary," as we have said, for certain purposes the industry will not accept it at all; but for those for which it will, the difference in price is ordinarily not very great; the judge found that it was between one and two cents a pound, hardly enough margin on which to base a monopoly. Indeed, there are times when all differential disappears, and "secondary" will actually sell at a higher price: i. e. when there is a supply available which contains just the alloy that a fabricator needs for the article which he proposes to make. Taking the industry as a whole, we can say nothing more definite than that, although "secondary" does not compete at all in some uses, (whether because of "sales resistance" only, or because of actual metallurgical inferiority), for most purposes it competes upon a substantial equality with "virgin." On these facts the judge found that "every pound of secondary or scrap aluminum which is sold in commerce displaces a pound of virgin aluminum which otherwise would, or might have been, sold." We agree: so far as "secondary" supplies the demand of such fabricators as will accept it, it increases the amount of "virgin" which must seek sale elsewhere; and it therefore results that the supply of that part of the demand which will accept only "virgin" becomes greater in proportion as "secondary" drives away "virgin" from the demand which will accept "secondary." (This is indeed the same argument which we used a moment ago to include in the supply that part of "virgin" which "Alcoa" fabricates; it is not apparent to us why the judge did not think it applicable to that item as well.) At any given moment therefore "secondary" competes with "virgin" in the ingot market; further, it can, and probably does, set a limit or "ceiling" beyond which the price of "virgin" cannot go, for the cost of its production will in the end depend only upon the expense of scavenging and reconditioning. It might seem for this reason that in estimating "Alcoa's" control over the ingot market, we ought to include the supply of "sec-

ondary," as the judge did. Indeed, it may be thought a paradox to say that anyone has the monopoly of a market in which at all times he must meet a competition that limits his price. We shall show that it is not.

In the case of a monopoly of any commodity which does not disappear in use and which can be salvaged, the supply seeking sale at any moment will be made up of two components: (1) the part which the putative monopolist can immediately produce and sell; and (2) the part which has been, or can be, reclaimed out of what he has produced and sold in the past. By hypothesis he presently controls the first of these components; the second he has controlled in the past, although he no longer does. During the period when he did control the second, if he was aware of his interest, he was guided, not alone by its effect at that time upon the market, but by his knowledge that some part of it was likely to be reclaimed and seek the future market. That consideration will to some extent always affect his production until he decides to abandon the business, or for some other reason ceases to be concerned with the future market. Thus, in the case at bar "Alcoa" always knew that the future supply of ingot would be made up in part of what it produced at the time, and, if it was as far-sighted as it proclaims itself, that consideration must have had its share in determining how much to produce. How accurately it could forecast the effect of present production upon the future market is another matter. Experience, no doubt, would help; but it makes no difference that it had to guess; it is enough that it had an inducement to make the best guess it could, and that it would regulate that part of the future supply, so far as it should turn out to have guessed right. The competition of "secondary" must therefore be disregarded, as soon as we consider the position of "Alcoa" over a period of years; it was as much within "Alcoa's" control as was the production of the "virgin" from which it had been derived. This can be well illustrated by the case of a lawful monopoly: e. g. a patent or a copyright. The monopolist cannot prevent those to whom he sells from reselling at whatever prices they please. United States v. General Electric Co., 272 U.S. 476, 484, 47 S. Ct. 192, 71 L.Ed. 362. Nor can he prevent their reconditioning articles worn by use, unless they in fact make a new article.

Wilson v. Simpson, 9 How. 109, 123, 13 L.Ed. 66. At any moment his control over the market will therefore be limited by that part of what he has formerly sold, which the price he now charges may bring upon the market, as second hand or reclaimed articles. Yet no one would think of saying that for this reason the patent or the copyright did not confer a monopoly. Again, consider the situation of the owner of the only supply of some raw material like iron ore. Scrap iron is a constant factor in the iron market; it is scavenged, remelted into pig, and sold in competition with newly smelted pig; an owner of the sole supply of ore must always face that competition and it will serve to put a "ceiling" upon his price, so far as there is enough of it. Nevertheless, no one would say that, even during the period while the pig which he has sold in the past can so return to the market, he does not have a natural monopoly. Finally, if "Alcoa" is right, precisely the same reasoning ought to lead us to include that part of clippings and trimmings which a fabricator himself saves and remelts—"process scrap"—for that too pro tanto reduces the market for "virgin." It can make no difference whether the original buyer reclaims, or a professional scavenger. Yet "Alcoa" itself does not assert that such "process scrap" competes; indeed it was at pains to prove that this scrap was not included in its computation of "secondary."

We conclude therefore that "Alcoa's" control over the ingot market must be reckoned at over ninety per cent; that being the proportion which its production bears to imported "virgin" ingot. If the fraction which it did not supply were the produce of domestic manufacture there could be no doubt that this percentage gave it a monopoly—lawful or unlawful, as the case might be. The producer of so large a proportion of the supply has complete control within certain limits. It is true that, if by raising the price he reduces the amount which can be marketed —as always, or almost always, happens— he may invite the expansion of the small producers who will try to fill the place left open; nevertheless, not only is there an inevitable lag in this, but the large producer is in a strong position to check such competition; and, indeed, if he has retained his old plant and personnel, he can inevitably do so. There are indeed

limits to his power; substitutes are available for almost all commodities, and to raise the price enough is to evoke them. United States v. Corn Products Refining Co., D. C., 234 F. 964, 976; United States v. Associated Press., D. C., 52 F.Supp. 362, 371; Fashion Originators Guild v. Federal Trade Commission, 2 Cir., 114 F. 2d 80, 85. Moreover, it is difficult and expensive to keep idle any part of a plant or of personnel; and any drastic contraction of the market will offer increasing temptation to the small producers to expand. But these limitations also exist when a single producer occupies the whole market: even then, his hold will depend upon his moderation in exerting his immediate power.

The case at bar is however different, because, for aught that appears there may well have been a practically unlimited supply of imports as the price of ingot rose. Assuming that there was no agreement between "Alcoa" and foreign producers not to import, they sold what could bear the handicap of the tariff and the cost of transportation. For the period of eighteen years—1920-1937—they sold at times a little above "Alcoa's" prices, at times a little under; but there was substantially no gross difference between what they received and what they would have received, had they sold uniformly at "Alcoa's" prices. While the record is silent, we may therefore assume—the plaintiff having the burden—that, had "Alcoa" raised its prices, more ingot would have been imported. Thus there is a distinction between domestic and foreign competition: the first is limited in quantity, and can increase only by an increase in plant and personnel; the second is of producers who, we must assume, produce much more than they import, and whom a rise in price will presumably induce immediately to divert to the American market what they have been selling elsewhere. It is entirely consistent with the evidence that it was the threat of greater foreign imports which kept "Alcoa's" prices where they were, and prevented it from exploiting its advantage as sole domestic producer; indeed, it is hard to resist the conclusion that potential imports did put a "ceiling" upon those prices. Nevertheless, within the limits afforded by the tariff and the cost of transportation, "Alcoa" was free to raise its prices as it chose, since it was free

from domestic competition, save as it drew other metals into the market as substitutes. Was this a monopoly within the meaning of § 2? The judge found that, over the whole half century of its existence, "Alcoa's" profits upon capital invested, after payment of income taxes, had been only about ten per cent, and, although the plaintiff puts this figure a little higher, the difference is negligible. The plaintiff does indeed challenge the propriety of computing profits upon a capital base which included past earnings that have been allowed to remain in the business; but as to that it is plainly wrong. An argument is indeed often made in the case of a public utility, that the "rate-base" should not include earnings re-invested which were greater than a fair profit upon the actual investment outstanding at the time. That argument depends, however, upon the premise that at common law—even in the absence of any commission or other authority empowered to enforce a "reasonable" rate —it is the duty of a public utility to charge no more than such a rate, and that any excess is unlawfully collected. Perhaps one might use the same argument in the case of a monopolist; but it would be a condition that one should show what part of the past earnings were extortionate, for not all that even a monopolist may earn is caput lupinum. The plaintiff made no such attempt, and its distinction between capital, "contributed by consumers" and capital, "contributed by shareholders," has no basis in law. "Alcoa's" earnings belonged to its shareholders, they were free to withdraw them and spend them, or to leave them in the business. If they chose to leave them, it was no different from contributing new capital out of their pockets. This assumed, it would be hard to say that "Alcoa" had made exorbitant profits on ingot, if it is proper to allocate the profit upon the whole business proportionately among all its products—ingot, and fabrications from ingot. A profit of ten per cent in such an industry, dependent, in part at any rate, upon continued tariff protection, and subject to the vicissitudes of new demands, to the obsolescence of plant and process—which can never be accurately gauged in advance—to the chance that substitutes may at any moment be discovered which will reduce the demand, and to the other hazards which attend all industry; a profit of ten per cent, so condi-

tioned, could hardly be considered extortionate.

■■ There are however, two answers to any such excuse; and the first is that the profit on ingot was not necessarily the same as the profit of the business as a whole, and that we have no means of allocating its proper share to ingot. It is true that the mill cost appears; but obviously it would be unfair to "Alcoa" to take, as the measure of its profit on ingot, the difference between selling price and mill cost; and yet we have nothing else. It may be retorted that it was for the plaintiff to prove what was the profit upon ingot in accordance with the general burden of proof. We think not. Having proved that "Alcoa" had a monopoly of the domestic ingot market, the plaintiff had gone far enough; if it was an excuse, that "Alcoa" had not abused its power, it lay upon "Alcoa" to prove that it had not. But the whole issue is irrelevant anyway, for it is no excuse for "monopolizing" a market that the monopoly has not been used to extract from the consumer more than a "fair" profit. The Act has wider purposes. Indeed, even though we disregarded all but economic considerations, it would by no means follow that such concentration of producing power is to be desired, when it has not been used extortionately. Many people believe that possession of unchallenged economic power deadens initiative, discourages thrift and depresses energy; that immunity from competition is a narcotic, and rivalry is a stimulant, to industrial progress; that the spur of constant stress is necessary to counteract an inevitable disposition to let well enough alone. Such people believe that competitors, versed in the craft as no consumer can be, will be quick to detect opportunities for saving and new shifts in production, and be eager to profit by them. In any event the mere fact that a producer, having command of the domestic market, has not been able to make more than a "fair" profit, is no evidence that a "fair" profit could not have been made at lower prices. United States v. Corn Products Refining Co., supra, 1014, 1015 (234 F. 964). True, it might have been thought adequate to condemn only those monopolies which could not show that they had exercised the highest possible ingenuity, had adopted every possible economy, had anticipated every conceivable improvement, stimulated every possible demand. No doubt, that would be one way of dealing with the matter, although it would imply constant scrutiny and constant supervision, such as courts are unable to provide. Be that as it may, that was not the way that Congress chose; it did not condone "good trusts" and condemn "bad" ones; it forbad all. Moreover, in so doing it was not necessarily actuated by economic motives alone. It is possible, because of its indirect social or moral effect, to prefer a system of small producers, each dependent for his success upon his own skill and character, to one in which the great mass of those engaged must accept the direction of a few. These considerations, which we have suggested only as possible purposes of the Act, we think the decisions prove to have been in fact its purposes.

■ It is settled, at least as to § 1, that there are some contracts restricting competition which are unlawful, no matter how beneficent they may be; no industrial exigency will justify them; they are absolutely forbidden. Chief Justice Taft said as much of contracts dividing a territory among producers, in the often quoted passage of his opinion in the Circuit Court of Appeals in United States v. Addystone Pipe & Steel Co., 6 Cir., 85 F. 271, 291, 46 L.R.A. 122. The Supreme Court unconditionally condemned all contracts fixing prices in United States v. Trenton Potteries Co., 273 U.S. 392, 397, 398, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989: and whatever doubts may have arisen as to that decision from Appalachian Coals Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825, they were laid by United States v. Socony-Vacuum Co., 310 U.S. 150, 220–224, 60 S.Ct. 811, 84 L.Ed. 1129. It will now scarcely be denied that the same notion originally extended to all contracts—"reasonable," or "unreasonable"—which restrict competition. United States v. Trans-Missouri Freight Association, 166 U.S. 290, 327, 328, 17 S.Ct. 540, 41 L.Ed. 1007; United States v. Joint Traffic Association, 171 U.S. 505, 575–577, 19 S.Ct. 25, 43 L.Ed. 259. The decisions in Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734, and American Tobacco Co. v. United States, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663, certainly did change this, and since then it has been accepted law that not all contracts which in fact put an end to existing competition are unlawful. Starting, however, with the authoritative premise that all contracts fixing prices are uncon-

ditionally prohibited, the only possible difference between them and a monopoly is that while a monopoly necessarily involves an equal, or even greater, power to fix prices, its mere existence might be thought not to constitute an exercise of that power. That distinction is nevertheless purely formal; it would be valid only so long as the monopoly remained wholly inert; it would disappear as soon as the monopoly began to operate; for, when it did—that is, as soon as it began to sell at all—it must sell at some price and the only price at which it could sell is a price which it itself fixed. Thereafter the power and its exercise must needs coalesce. Indeed it would be absurd to condemn such contracts unconditionally, and not to extend the condemnation to monopolies; for the contracts are only steps toward that entire control which monopoly confers: they are really partial monopolies.

■ But we are not left to deductive reasoning. Although in many settings it may be proper to weigh the extent and effect of restrictions in a contract against its industrial or commercial advantages, this is never to be done when the contract is made with intent to set up a monopoly. As much was plainly implied in Swift & Co. v. United States, 196 U.S. 375, 396, 25 S. Ct. 276, 49 L.Ed. 518, where the court spoke of monopoly as being the "result" which the law seeks to prevent; and, although the language on pages 60 and 61 of Standard Oil Co. v. United States, 221 U.S. 1, 31 S. Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734, is not altogether clear, it seems to presuppose as a premise that a monopoly is always an "unreasonable restraint of trade." Again, the opinion in Sugar Institute v. United States, 297 U.S. 553, 598, 56 S.Ct. 629, 642, 80 L.Ed. 859, borrowing from Appalachian Coals Inc. v. United States, supra, 288 U.S. 344, 374, 53 S.Ct. 471, 77 L.Ed. 825, said: "Accordingly we have held that a co-operative enterprise otherwise free from objection, which carries with it no monopolistic menace" need not always be condemned. These were indeed only thrown out as steps in the argument; but Fashion Originators Guild v. Federal Trade Commission, 312 U.

S. 457, 61 S.Ct. 703, 85 L.Ed. 949, was a ruling. That concerned a combination of dressmakers who set up a boycott against all retailers who should deal in dresses copied—"pirated"—from the dressmakers' designs. Before the Commission the dressmakers had offered to prove that "the practices of FOGA were reasonable and necessary to protect the manufacturer, laborer, retailer and consumer against devastating evils growing from the pirating of original designs and had in fact benefitted all four." (312 U.S. at page 467, 61 S.Ct. 708). All such evidence the Commission refused to hear, raising as sharply as possible the issue whether the combination could excuse itself as "reasonable" because of the benefits it conferred upon the industry. The court sustained the Commission because "the purpose and object of this combination, its potential power, its tendency to monopoly, the coercion it could and did practice upon a rival method of competition, all brought it within the policy of the prohibition", 312 U.S. 457 at page 467, 61 S.Ct. 708. Moreover, the Clayton Act itself, §§ 14 and 18, 15 U.S.C.A., shows that practices harmless in themselves will not be tolerated when they "tend to create a monopoly." Perhaps, it has been idle to labor the point at length; there can be no doubt that the vice of restrictive contracts and of monopoly is really one, it is the denial to commerce of the supposed protection of competition. To repeat, if the earlier stages are proscribed, when they are parts of a plan, the mere projecting of which condemns them unconditionally, the realization of the plan itself must also be proscribed.

■ We have been speaking only of the economic reasons which forbid monopoly; but, as we have already implied, there are others, based upon the belief that great industrial consolidations are inherently undesirable, regardless of their economic results. In the debates in Congress Senator Sherman himself in the passage quoted in the margin showed that among the purposes of Congress in 1890 was a desire to put an end to great aggregations of capital because of the helplessness of the individual before them.[1] Another aspect of the

[1] "If the concerted powers of this combination are intrusted to a single man, it is a kingly prerogative, inconsistent with our form of government, and should be subject to the strong resistance of the State and national authorities * * *." 21 Cong. Record, 2457.

"The popular mind is agitated with problems that may disturb social order, and among them all none is more threatening

same notion may be found in the language of Mr. Justice Peckham in United States v. Trans-Missouri Freight Association, supra, at page 323 (166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007). That Congress is still of the same mind appears in the Surplus Property Act of 1944, 50 U.S.C.A.Appendix § 1611 et seq., and the Small Business Mobilization Act, 50 U.S.C.A.Appendix § 1101 et seq. Not only does § 2(d) of the first declare it to be one aim of that statute to "preserve the competitive position of small business concerns," but § 18 is given over to directions designed to "preserve and strengthen" their position. In United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788, a later statute in pari materia was considered to throw a cross light upon the Anti-trust Acts, illuminating enough even to override an earlier ruling of the court. Throughout the history of these statutes it has been constantly assumed that one of their purposes was to perpetuate and preserve, for its own sake and in spite of possible cost, an organization of industry in small units which can effectively compete with each other. We hold that "Alcoa's" monopoly of ingot was of the kind covered by § 2.

■ It does not follow because "Alcoa" had such a monopoly, that it "monopolized" the ingot market: it may not have achieved monopoly; monopoly may have been thrust upon it. If it had been a combination of existing smelters which united the whole industry and controlled the production of all aluminum ingot, it would certainly have "monopolized" the market. In several decisions the Supreme Court has decreed the dissolution of such combinations, although they had engaged in no unlawful trade practices. Perhaps we should not count among these Northern Securities Co. v. United States, 193 U.S. 197, 327, 24 S.Ct. 436, 48 L.Ed. 679, because it was decided under the old dispensation which ended with Standard Oil Co. v. United States, supra, (221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734); but the following cases were later. United

States v. Union Pacific R. Co., 226 U.S. 61, 88, 33 S.Ct. 53, 57 L.Ed. 124; International Harvester v. Missouri, 234 U.S. 199, 209, 34 S.Ct. 859, 58 L.Ed. 1276, 52 L.R.A.,N.S., 525; United States v. Reading Co., 253 U.S. 26, 57–59, 40 S.Ct. 425, 64 L.Ed. 760; United States v. Southern Pacific Co., 259 U.S. 214, 230, 231, 42 S.Ct. 496, 66 L.Ed. 907. We may start therefore with the premise that to have combined ninety per cent of the producers of ingot would have been to "monopolize" the ingot market; and, so far as concerns the public interest, it can make no difference whether an existing competition is put an end to, or whether prospective competition is prevented. The Clayton Act itself speaks in that alternative: "to injure, destroy, or prevent competition." § 13(a) 15 U.S.C.A. Nevertheless, it is unquestionably true that from the very outset the courts have at least kept in reserve the possibility that the origin of a monopoly may be critical in determining its legality; and for this they had warrant in some of the congressional debates which accompanied the passage of the Act. In Re Greene, C.C.Ohio, 52 F. 104, 116, 117; United States v. Trans-Missouri Freight Association, 8 Cir., 58 F. 58, 82, 24 L.R.A. 73. This notion has usually been expressed by saying that size does not determine guilt; that there must be some "exclusion" of competitors; that the growth must be something else than "natural" or "normal"; that there must be a "wrongful intent," or some other specific intent; or that some "unduly" coercive means must be used. At times there has been emphasis upon the use of the active verb, "monopolize," as the judge noted in the case at bar. United States v. Standard Oil Co., C.C.Mo., 173 F. 177, 196; United States v. Whiting, D.C., 212 F. 466, 478; Patterson v. United States, 6 Cir., 222 F. 599, 619; National Biscuit Co. v. Federal Trade Commission, 2 Cir., 299 F. 733, 738. What engendered these compunctions is reasonably plain; persons may unwittingly find themselves in possession of a monopoly, automatically so to say: that is, without having intended either to put an end to existing competition, or to prevent

than the inequality of condition, of wealth, and opportunity that has grown within a single generation out of the concentration of capital into vast combinations to control production and trade and to break down competition. These combinations already defy or control powerful transportation corporations and reach State authorities. They reach out their Briarean arms

to every part of our country. They are imported from abroad. Congress alone can deal with them, and if we are unwilling or unable there will soon be a trust for every production and a master to fix the price for every necessity of life. * * *" 21 Cong. Record, 2460. See also 21 Cong. Record 2598.

competition from arising when none had existed; they may become monopolists by force of accident. Since the Act makes "monopolizing" a crime, as well as a civil wrong, it would be not only unfair, but presumably contrary to the intent of Congress, to include such instances. A market may, for example, be so limited that it is impossible to produce at all and meet the cost of production except by a plant large enough to supply the whole demand. Or there may be changes in taste or in cost which drive out all but one purveyor. A single producer may be the survivor out of a group of active competitors, merely by virtue of his superior skill, foresight and industry. In such cases a strong argument can be made that, although, the result may expose the public to the evils of monopoly, the Act does not mean to condemn the resultant of those very forces which it is its prime object to foster: finis opus coronat. The successful competitor, having been urged to compete, must not be turned upon when he wins. The most extreme expression of this view is in United States v. United States Steel Corporation, 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121, from which we quote in the margin;[2] and which Sanford, J., in part repeated in United States v. International Harvester Corporation, 274 U.S. 693, 708, 47 S.Ct. 748, 71 L.Ed. 1302. It so chances that in both instances the corporation had less than two-thirds of the production in its hands, and the language quoted was not necessary to the decision; so that even if it had not later been modified, it has not the authority of an actual decision. But, whatever authority it does have was modified by the gloss of Cardozo, J., in United States v. Swift & Co., 286 U.S. 106, p. 116, 52 S. Ct. 460, 463, 76 L.Ed. 999, when he said, "Mere size * * * is not an offense against the Sherman Act unless magnified to the point at which it amounts to a monopoly * * * but size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past." "Alcoa's" size was "magnified" to make it a "monopoly"; indeed, it has never been anything else; and its size, not only offered it an "opportunity for abuse," but it "utilized" its size for "abuse," as can easily be shown.

It would completely misconstrue "Alcoa's" position in 1940 to hold that it was the passive beneficiary of a monopoly, following upon an involuntary elimination of competitors by automatically operative economic forces. Already in 1909, when its last lawful monopoly ended, it sought to strengthen its position by unlawful practices, and these concededly continued until 1912. In that year it had two plants in New York, at which it produced less than 42 million pounds of ingot; in 1934 it had five plants (the original two, enlarged; one in Tennessee; one in North Carolina; one in Washington), and its production had risen to about 327 million pounds, an increase of almost eight-fold. Meanwhile not a pound of ingot had been produced by anyone else in the United States. This increase and this continued and undisturbed control did not fall undesigned into "Alcoa's" lap; obviously it could not have done so. It could only have resulted, as it did result, from a persistent determination to maintain the control, with which it found itself vested in 1912. There were at least one or two abortive attempts to enter the industry, but "Alcoa" effectively anticipated and forestalled all competition, and succeeded in holding the field alone. True, it stimulated demand and opened new uses for the metal, but not without making sure that it could supply what it had evoked. There is no dispute as to this; "Alcoa" avows it as evidence of the skill, energy and initiative with which it has always conducted its business; as a reason why, having won

[2] Justice McKenna for the majority said, 251 U.S. 417 at page 451, 40 S.Ct. 299: "The corporation is undoubtedly of impressive size, and it takes an effort of resolution not to be affected by it or to exaggerate its influence. But we must adhere to the law, and the law does not make mere size an offense, or the existence of unexerted power an offense. It, we repeat, requires overt acts and trusts to its prohibition of them and its power to repress or punish them. It does not compel competition, nor require all that is possible." The minority through Day, J. agreed, 251 U.S. 417 at page 460, 40 S.Ct. 302: "the act offers no objection to the mere size of a corporation, nor to the continued exertion of its lawful power, when that size and power have been obtained by lawful means and developed by natural growth, although its resources, capital and strength may give to such corporation a dominating place in the business and industry with which it is concerned. It is entitled to maintain its size and the power that legitimately goes with it, provided no law has been transgressed in obtaining it."

its way by fair means, it should be commended, and not dismembered. We need charge it with no moral derelictions after 1912; we may assume that all it claims for itself is true. The only question is whether it falls within the exception established in favor of those who do not seek, but cannot avoid, the control of a market. It seems to us that that question scarcely survives its statement. It was not inevitable that it should always anticipate increases in the demand for ingot and be prepared to supply them. Nothing compelled it to keep doubling and redoubling its capacity before others entered the field. It insists that it never excluded competitors; but we can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel. Only in case we interpret "exclusion" as limited to manoeuvres not honestly industrial, but actuated solely by a desire to prevent competition, can such a course, indefatigably pursued, be deemed not "exclusionary." So to limit it would in our judgment emasculate the Act; would permit just such consolidations as it was designed to prevent.

 "Alcoa" answers that it positively assisted competitors, instead of discouraging them. That may be true as to fabricators of ingot; but what of that? They were its market for ingot, and it is charged only with a monopoly of ingot. We can find no instance of its helping prospective ingot manufacturers. We do not forget the Southern Aluminum Company in whose origin it did have some part; though that was over before the end of 1914 and was in any event scarcely late enough to count. We are speaking, not of its purchase of the remains of the plant in 1915; we are not

suggesting—as the plaintiff argues—that that was a move to keep the plant out of the ingot market; we are speaking of the original venture. In December, 1911, Arthur V. Davis was in Europe, engaged in forming the "cartel" of 1912, which we will assume not to have been meant to affect the production of ingot in the United States; for so the judge found. The first form of the project was a corporation in which all the members of that "cartel" were to share—"Alcoa," through its Canadian subsidiary. That plan was abandoned; but the French interests, which had been parties to it, organized the Southern Aluminum Company in its place; and the correspondence between those interests and "Alcoa" in 1913—especially the French letter of April 16 and "Alcoa's" answer of May 10—even though it may not justify the conclusion that the two were acting in conjunction, leaves no doubt that they were not to be competitors at arms length.[3] Perhaps, as the plaintiff argues, "Alcoa" did think that the new project might be useful in persuading the plaintiff, whose attack had just ended in the decree of 1912, that the company was to be a real competitor. Be that as it may, the expected competition was not to be of the ordinary kind.

 We disregard any question of "intent." Relatively early in the history of the Act—1905—Holmes, J., in Swift & Co. v. United States, supra, (196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518), explained this aspect of the Act in a passage often quoted. Although the primary evil was monopoly, the Act also covered preliminary steps, which, if continued, would lead to it. These may do no harm of themselves; but, if they are initial moves in a plan or scheme which, carried out, will result in monopoly, they are dangerous and the law will nip them in the bud. For this reason conduct falling short of monopoly, is not illegal unless it is

---

[3] For example, the first letter contained the following: "I do not believe that the political conditions existing in the United States make it advisable to associate our aluminium companies, even for the fabrication of alumina. Mr. Sternfeld, whom I talked with in Paris a few days ago, told me that in his conversations with you on the subject he was under the impression that you are of the same opinion as I, and that it would be preferable for your company, the Southern and the Northern each to work alone in all branches of fabrication and commerce." And again: "It would evidently be better for the equilibrium of the market if we would take a large portion of our supply of power with the view of producing nitrures" (nitrates?) "rather than to employ the whole to increase our production of metal." The answer in part read: "As to whether it is wiser to build at first one plant in the United States conjointly between the Southern Aluminum Company and the Aluminum Company of America is to my mind rather a detail, and, if you prefer to have the Southern Company build its own plant at Whitney, while the Aluminum Company builds another for itself, I see no objection to that procedure."

part of a plan to monopolize, or to gain such other control of a market as is equally forbidden. To make it so, the plaintiff must prove what in the criminal law is known as a "specific intent"; an intent which goes beyond the mere intent to do the act. By far the greatest part of the fabulous record piled up in the case at bar, was concerned with proving such an intent. The plaintiff was seeking to show that many transactions, neutral on their face, were not in fact necessary to the development of "Alcoa's" business, and had no motive except to exclude others and perpetuate its hold upon the ingot market. Upon that effort success depended in case the plaintiff failed to satisfy the court that it was unnecessary under § 2 to convict "Alcoa" of practices unlawful of themselves. The plaintiff has so satisfied us, and the issue of intent ceases to have any importance; no intent is relevant except that which is relevant to any liability, criminal or civil: i. e. an intent to bring about the forbidden act. Note 59 of United States v. Socony-Vacuum Oil Co., supra, 310 U.S. 150 on page 226, 60 S.Ct. 811, on page 845, 84 L. Ed. 1129, on which "Alcoa" appears so much to rely, is in no sense to the contrary. Douglas, J., was answering the defendants' argument that, assuming that a combination had attempted to fix prices, it had never had the power to do so, for there was too much competing oil. His answer was that the plan was unlawful, even if the parties did not have the power to fix prices, provided that they intended to do so; and it was to drive home this that he contrasted the case then before the court with monopoly, where power was a necessary element. In so doing he said: "An intent and a power * * * are then necessary," which he at once followed by quoting the passage we have just mentioned from Swift & Co. v. United States, supra, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518. In order to fall within § 2, the monopolist must have both the power to monopolize, and the intent to monopolize. To read the passage as demanding any "specific," intent, makes nonsense of it, for no monopolist monopolizes unconscious of what he is doing. So here, "Alcoa" meant to keep, and did keep, that complete and exclusive hold upon the ingot market with which it started. That was to "monopolize" that market, however innocently it otherwise proceeded. So far as the judgment held that it was not within § 2, it must be reversed.

## II.
### "Alcoa's" Unlawful Practices.

As we have said, the plaintiff also sought to convict "Alcoa" of practices in which it engaged, not because they were necessary to the development of its business, but only in order to suppress competitors. Since we are holding that "Alcoa" "monopolized" the ingot market in 1940, regardless of such practices, these issues might be moot, if it inevitably followed from our holding that "Alcoa" must be dissolved. It could be argued that the new companies which would then emerge, should not be charged in retrospect with their predecessor's illegal conduct; but should be entitled to start without the handicap of injunctions, based upon its past. Possibly that would be true, except that conditions have so changed since the case was closed, that, as will appear, it by no means follows, because "Alcoa" had a monopoly in 1940, that it will have one when final judgment is entered after the war. That judgment may leave it intact as a competing unit among other competing units, and the plaintiff might argue, and undoubtedly will, that, if it was in the past guilty of practices, aimed at "monopolizing" the ingot market, it would be proper and necessary to enjoin their resumption, even though it no longer will have a monopoly. For this reason it appears to us that the issues are not altogether moot. In spite of the prolixity of the evidence, the challenged practices can be divided into three classes: (a) the "preemption" of bauxite deposits and water power; (b) the suppression of several efforts by competitors to invade either the ingot market, or some of the markets for fabricated goods; (c) the "domination" of the markets for such goods, and particularly of the markets for "sheet" and "cable."

### (a) "Pre-emption" of Bauxite and Water-Power.

The plaintiff attempted to prove, and asserts that it did prove, that "Alcoa" bought up bauxite deposits, both in Arkansas—the chief source of the mineral in the United States—and in Dutch, and British, Guiana, in excess of its needs, and under circumstances which showed that the purchases were not for the purpose of securing an adequate future supply, but only in order to seize upon any available supply and so assure its monopoly. The very statement of this charge shows that it depends upon "Alcoa's" intent, for, if the purchases pro

vided for the future needs of the business, or for what "Alcoa" honestly believed were its future needs, they were innocent. In its effort to show such an intent, here and elsewhere, the plaintiff made the whole history of the industry from its beginning the subject of inquiry, with a persistence which left no corner unsearched. The judge heard the evidence with unmatched patience, and punctilious care and minuteness; and with equal industry and detail considered it for almost a year before he gave his opinion, in which he overruled all the plaintiff's contentions. The plaintiff's brief before us seems to intimate that in doing so he was actuated by a bias in "Alcoa's" favor; and, if by that is meant that "Alcoa" completely satisfied him of its innocence throughout, bias he certainly showed. That, however, is precisely the bias which all evidence is intended to create, and which it should create, if a court does its duty. If, on the other hand, it is suggested that into his conclusions there entered motives, not derived from the evidence, the record is utterly devoid of any support for it.

 We assume that Federal Rules of Civil Procedure, Rule 52(a), 28 U.S.C. A. following section 723c, applies as well to appeals taken under Rule 72, as to those taken under Rule 75, although it makes very little difference whether or not it does, because Rule 52(a) in substance merely carried over the earlier practice in equity to all trials before a judge. State Farm Mutual Automobile Insurance Co. v. Bonacci, 8 Cir., 111 F.2d 412, 415; Petterson Lighterage & Towing Corporation v. New York Central R. Co., 2 Cir., 126 F.2d 992, 995; Katz Underwear Co. v. United States, 3 Cir., 127 F.2d 965, 966; 3 Moore's Federal Practice, § 52.01. It is idle to try to define the meaning of the phrase, "clearly erroneous"; all that can be profitably said is that an appellate court, though it will hesitate less to reverse the finding of a judge than that of an administrative tribunal or of a jury, will nevertheless reverse it most reluctantly and only when well persuaded. This is true to a considerable degree even when the judge has not seen the witnesses. His duty is to sift the evidence, to put it into logical sequence and to make the proper inferences from it; and in the case of a record of over 40,000 pages like that before us, it is physically impossible for an appellate court to function at all without ascribing some prima

facie validity to his conclusions. Consumers Import Co. v. Kawasaki, 2 Cir., 133 F. 2d 781, 787. What the plaintiff is really asking is that we shall in effect reconsider the whole evidence de novo, as though it had come before us in the first instance. The impossibility of that at once appears, if we consider what it would have involved, had the appeal taken its usual course and been heard by the nine justices of the Supreme Court. However, whatever may be said in favor of reversing a trial judge's findings when he has not seen the witnesses, when he has, and in so far as his findings depend upon whether they spoke the truth, the accepted rule is that they "must be treated as unassailable." Davis v. Schwartz, 155 U.S. 631, 636, 15 S.Ct. 237, 39 L.Ed. 289; Adamson v. Gilliland, 242 U.S. 350, 353, 37 S.Ct. 169, 61 L.Ed. 356; Alabama Power Co. v. Ickes, 302 U.S. 464, 477, 58 S.Ct. 300, 82 L.Ed. 374. The reason for this is obvious and has been repeated over and over again; in such cases the appeal must be decided upon an incomplete record, for the printed word is only a part, and often by no means the most important part, of the sense impressions which we use to make up our minds. Morris Plan Industrial Bank v. Henderson, 2 Cir., 131 F.2d 975, 977. Since an appellate court must have some affirmative reason to reverse anything done below, to reverse a finding it must appear from what the record does preserve that the witnesses could not have been speaking the truth, no matter how transparently reliable and honest they could have appeared. Even upon an issue on which there is conflicting direct testimony, appellate courts ought to be chary before going so far; and upon an issue like the witness's own intent, as to which he alone can testify, the finding is indeed "unassailable," except in the most exceptional cases.

 In the case at bar, the first issue was whether, when "Alcoa" bought up the bauxite deposits, it really supposed that they would be useful in the future. It would be hard to imagine an issue in which the credibility of the witnesses should more depend upon the impressions derived from their presence. "Alcoa" relied principally upon the testimony of three of its officers, though there were some issues (the purchase of bauxite was among them), as to which not all three testified. These were the chairman of its board, Arthur V. Davis; its president, Roy A. Hunt; and Da-

vis' brother, Edward K. Davis, a former vice-president. Arthur V. Davis was on the stand for seven weeks; his testimony. occupies 844 printed pages on the direct and 1445, on the cross; Edward K. Davis, called by the plaintiff, was on the stand six weeks; his direct occupies 1727 pages and his cross, 146; Hunt was on the stand two weeks; in his case the corresponding figures are 266 and 346. Thus the judge had an unrivaled opportunity to observe how they bore themselves under a most prolonged and searching test; and he went out of his way to commend their candor and credibility. Nor could the issue turn upon the dependability of their memory; they knew why they had bought the bauxite; they were either speaking the truth, or perjuring themselves, not only upon this issue but elsewhere throughout this amazing record. Evidence must be beyond measure convincing which leads to that conclusion in the face of the most positive assurance from the only impartial observer at the time, that they seemed to him men of honor and veracity. While it is of course true that they had an interest to excuse their past conduct and that the transactions admitted a sinister interpretation, neither of these facts was conclusive. Upon this, as upon all the issues, the plaintiff had the burden and must lose unless it succeeded in doing more than leaving the proof in balance. Taking all these considerations together, it seems plain to us that we should be unwarranted in declaring these findings "clearly erroneous."

Little need be added as to the similar charge that "Alcoa" bought up suitable water power which it did not need; and did so for the purpose of preventing competition. It did buy a number of such sites which it did not fully use; but, considering the extraordinary increase in ingot production which in fact took place even without the witnesses' explanations the inference which the plaintiff asks us to draw would be weak indeed; and certainly we should not be justified in holding that it overbore those explanations.

*(b) Suppression of Competitors Seeking to Invade the Ingot Market.*

The plaintiff relies upon two transactions as showing that "Alcoa" tried to suppress incipient competition by purchasing interests in two Norwegian aluminum companies; and a third, by purchasing interests in water-power at the head of the Saguenay River, Canada. The Ford Motor Company, in the winter of 1920–1921, wished to secure an independent source of aluminum; and one of its representatives met Haskell, the president of the Baush Company, and consulted him about getting one. Haskell in that winter saw Kloumann, the representative of a Norwegian company, which we may call "A. H. Norsk"; and Haskell got an option on the property. There was a sharp dispute as to whether Arthur V. Davis learned of these negotiations; but we shall assume that he did so shortly after May 18, 1921, in spite of the fact that the letter which conveyed that information was excluded. In the following July, "Alcoa" agreed with Kloumann to buy a half interest in "A. H. Norsk," and bought it in October, 1922, after Davis had got permission from the Attorney General in accordance with the requirements of the decree of 1912. In the letter in which he stated the case to the Attorney General, Davis declared that he wished to have the property in order to compete with German producers abroad; and that is the reason which he gave on the stand, and which the judge accepted. This evidence also admits the interpretation that Davis wished to head off Haskell, and perhaps in fact he did; but we cannot see that the issue differs from that which arose over the purchases of bauxite and water-power. It is impossible to say á priori what motive actuated Davis; even though he knew that his purchase would interrupt Haskell's negotiations on behalf of the Ford Company, it by no means follows that he did not wish the property for the reasons he gave to the Attorney General. Indeed, the plaintiff did not prove that there were no other sources of foreign aluminum open to the Ford Company; or even that there were no plants which it could have bought. The purchase of the other Norwegian plant had no accompaniment of cutting out American competition; as to it "Alcoa's" good faith must certainly be accepted.

The last transaction was "Alcoa's" intervention in a large power development at the source of the Saguenay River in Lake St. John, Canada. This lake is of large area and capacity; and at some time before 1922, James B. Duke, a very rich financier, had secured two water-powers close to the outlet, about eighteen miles apart, called the Upper, and Lower, Developments. The Upper Development was built by 1924, but the Lower Development

was not completed till 1931. In 1922 a representative of Duke proposed to Davis that he should take some of the power from the Upper Development but nothing was done; but in 1924 "Alcoa" was planning to build a plant at Arvida, near the Saguenay River; and at some time after October 15 of that year, Davis and Duke resumed negotiations, though this time for the purchase of the Lower Development. These resulted in its purchase in July, 1925, by means of a merger into "Alcoa" of one of Duke's corporations, which owned the property. When Duke died in October, 1925, his executors wished to dispose of the Upper Development also, and "Alcoa" obtained a fifty-three and one-half per cent interest in it during the spring of 1926. All the power used at Arvida has come from the Upper Development; and "Alcoa," after finishing the Lower Development, sold the power to others, until "Limited" acquired the property in 1938.

In October, 1924, the brothers, Uihlein, who had formerly been brewers in St. Louis, and had already bought a bauxite deposit in British Guiana, conferred with Duke about using the power of the Upper Development to make ingot; but nothing came of these negotiations. Davis said that the Uihleins told him that, when he and Duke began to deal with each other in the autumn of 1924, they had entirely abandoned the idea of going into the aluminum business, and so the judge found. The Uihleins, having given up the bauxite business, sold out their deposits in British Guiana in December, 1924, to three equal interests, of which "Alcoa" was one. (This was one of the purchases considered in the preceding heading.) Haskell on his own account also negotiated with Duke for an interest in the Upper Development, but these negotiations had ended before Duke's death. The plaintiff argues that "Alcoa" was aware of the negotiations between Duke and the Uihleins, and between Duke and Haskell; and knew that, once it had secured the Lower Development, Duke was sure to lose interest in any independent aluminum plant. It adds that the fact that "Alcoa" has never used the Lower Development to manufacture ingot, shows that it must have been bought for another purpose. "Alcoa" answers that its original purpose was to develop the Lower Development after the Arvida plant had been built, meanwhile taking power from the Upper; that it was only after Duke's death that it bought a share in the Upper; and

that the Uihlein and Haskell projects had nothing to do with its purchase of the Lower Development. This answer is not so patently implausible an explanation that the judge was bound to reject it, and to find that the plaintiff had carried the burden of proof upon the issue.

## (c) "Alcoa's" Domination of the Fabricating Fields.

The last of "Alcoa's" supposedly unlawful practices was its infiltration into, and manipulation of, some of the markets for fabricated goods. These were three kinds: (1) buying an interest in the Aluminum Castings Company, and Aluminum Manufactures, Inc.; (2) the "Price Squeeze"; (3) the "Piston Patent Pool." (1) "Castings" were one of the earliest uses of aluminum; "Alcoa" began to make them about 1901, and by 1909 there were a number of companies engaged in the business. Five of these combined in that year to form the Aluminum Castings Company, of whose shares "Alcoa" received fifty per cent in exchange for advances made at the time. It does not appear what proportion of the total output these five companies had been manufacturing; certainly the plaintiff did not prove that they controlled the castings market. Later they acquired a sixth foundry; and in 1919 the combination was reorganized as Aluminum Manufactures, Inc. In 1922 it leased all its real estate and machinery to "Alcoa" for twenty-five years, and may be regarded as thereafter a subsidiary. We cannot see that in all this the plaintiff has proved anything relevant to the action. If it means that there was a monopoly of the castings market as such, there is no support whatever in the record for such an assertion. If it means that "Alcoa's" intervention in the castings business helps to support its claim that "Alcoa" monopolized the ingot market, the inference is extremely weak. Finally, there was nothing in the transactions themselves which indicated that they were independently unlawful, or that they served to make "Alcoa's" legal position as to the ingot industry less vulnerable than it would otherwise have been.

The Aluminum Goods Manufacturing Company makes cooking and other utensils out of aluminum. It was formed in 1909 by the consolidation of three small companies; all its plants are in Wisconsin, and its principal place of business is in that state. At the trial thirty-one per cent of

436

the shares were held by "Alcoa" and its officers, and this proportion had been thirty-six per cent in 1918. The proportion of the shares held by the three families, which had originally owned the combining companies, was almost thirty-six per cent, and if there were added the shares owned by employees and by residents of the town where the principal business is, the percentage was originally over fifty per cent and has so remained. Four of the six directors have always represented the original interests; the other two have represented "Alcoa's" interest. The four have frequently shown entire independence of "Alcoa," and on several occasions have overruled its two directors, although the two companies have, very naturally, usually acted in unison. Again, we are not clear whether the plaintiff means to argue that by its holdings in this company "Alcoa" "monopolizes," or has attempted to "monopolize," the utensil market; if so, there is no support for it. If on the other hand, the charge is that "Alcoa" invested in the company as part of its monopoly of the ingot market, that may be true. It may have hoped in this way to secure at least a friendly market for its ingot, if ingot competition should increase. As part of its general conduct after the Bradley patent expired, this purchase may thus be relevant, just as its investment in the castings business may be; but, like its investment in that business, there is nothing to support the conclusion that here was a practice or manoeuvre merely to suppress or exclude competitors; and there was no justification for joining the Aluminum Goods Manufacturing Company as a defendant.

### (2) The "Price Squeeze."

The plaintiff describes as the "Price Squeeze" a practice by which, it says, "Alcoa" intended to put out of business the manufacturers of aluminum "sheet" who were its competitors; for "Alcoa" was itself a large—in fact much the largest—maker of that product, and had been the first to introduce it many years before the period in question. The challenged practice ended with the year 1932, shortly after the Department of Justice took up the complaints of several "sheet" makers, and began to investigate. The plaintiff says that the "squeeze" had been in operation for a long time before the year 1925, and that by means of it "Alcoa" had succeeded in eliminating four out of the eight companies which competed with it. However, it will

not be necessary to go back of 1925, for the only question before us is whether an injunction shall go, and a test of that is whether the practice in the years 1925–1932, inclusive, was unlawful. If it was, the time when it began is irrelevant; if it was not, it was equally lawful in the earlier years. We shall not describe the manufacture of "sheet"—"sheet rolling"—beyond saying that "rolling ingot," not "notched bar ingot," must be used, and that it is forced between two rollers until it gets to the desired thickness: "gauge." It is made as "coiled sheet" or "flat sheet"; also the metal may be hardened by various alloys to bring up its tensile strength. The "squeeze" is asserted to have been exercised upon five "gauges" of "coiled sheet," four "gauges" of "flat sheet" and five "gauges" of alloyed metal—called "Duralumin."

Between the years 1925 and 1937 inclusive "Alcoa's" books show the price of all these kinds of "sheet" for the "gauges" in question, together with the cost of making it from ingot. They also show the price of ingot, which was of course the same for all "gauges" and for all kinds of "sheet," as it was the same for all uses of aluminum other than "sheet." We are accepting as a basis the tables appearing as Section XVII of the Appendix to the plaintiff's brief—which is more favorable to "Alcoa" than those which the judge used. Except for the years 1925–1928, inclusive, these tables do not include as an item of cost, "Unabsorbed Burden"; an accounting allowance, computed to cover the expense and loss properly to be attributed to that part of "Alcoa's" plant which was not being used during each year. We cannot see why it was not a proper item to include in the cost of production, for it was to be expected that other "sheet rollers" also would be unable to keep their plants fully occupied; and, if so, over a term of years they would have to "absorb" the ensuing loss in the price of the product. Moreover, as we have said, "Alcoa" itself so kept its books for the first four years of the period in question. Those were prosperous years during which the item was not likely to have been large, but even though we were to deduct in those years the average for the years in which "Alcoa" deducted it, the difference this would make in the average cost of "sheet" for the years before 1933 is trifling. At the expense of logical consistency and in order not to complicate the computations unduly, we have used the tables as they stand.

The plaintiff's theory is that "Alcoa" consistently sold ingot at so high a price that the "sheet rollers," who were forced to buy from it, could not pay the expenses of "rolling" the "sheet" and make a living profit out of the price at which "Alcoa" itself sold "sheet." To establish this the plaintiff asks us to take "Alcoa's" costs of "rolling" as a fair measure of its competitors' costs, and to assume that they had to meet "Alcoa's" price for all grades of "sheet," and could not buy ingot elsewhere. It seems to us altogether reasonable, in the absence of proof to the contrary, to suppose that "Alcoa's" "rolling" costs were not higher than those of other "sheet rollers"; and, although it is true that theoretically, imported "virgin" was always available, for the reasons we have already given when we were discussing the monopoly in ingot, we think that it could at best be had at very little less than "Alcoa's" prices. As for "secondary," there were a number of uses for "sheet" for which the trade would not accept such of it as was available in the years in question. Besides, the "spread" between suitable grades of "secondary" and "virgin" was also very small.

Compressing into reasonable compass what the tables show, the result is as follows. For all the five "gauges" of "coiled sheet" for eight years, 1925—1932, the average profit open to competing "rollers" was .84 cents a pound, as against 4.7 cents for the five succeeding years, 1933–1937. The corresponding figures for "flat sheet" were .59 cents and 4 cents; and for "Duralumin," 4.9 cents and 11.8 cents. Moreover, in 31 instances out of 112 there was no "spread" at all; that is, the cost of ingot plus the cost of "rolling" was greater than the price at which "Alcoa" was selling "sheet." Obviously, there was in the eight years little or no inducement to continue in the "sheet" business, and Baush, the only "roller" of "Duralumin," gave up in 1931, although "Alcoa" insists, and the judge found, that this was because of its inefficiency. There can be little doubt that "Alcoa" changed the price of ingot in 1933 because it feared some action by the Department. True, it dropped the cost of ingot only about two and a half cents, and that advantage did not all inure to the profit of "sheet rollers," for the price of the majority of the "gauges" in all three kinds of "sheet" fell as well. However, the cost of making "sheet" also fell for every "gauge," and that in some part off-

set the fall in the price of "sheet." There resulted an average net gain in 1933 in all "gauges" of "coiled sheet" of 2.84 cents a pound; and the corresponding figure for "flat sheet" was 4.49 cents, and for "Duralumin," 3.14 cents. Moreover, although this advantage necessarily varied during the years 1934-1937, the cost of ingot—the most important factor—continued to be lower than in 1933 for all the following years except 1937, and then it was higher by only a quarter of a cent. The judge held and we agree that the "squeeze" was eliminated by lowering the price of ingot; and to do so "Alcoa" had to reduce the price, not only to "sheet rollers," but to all customers who bought ingot for any purpose. The drop of two and one half cents in 1933 went along with an actual—though it is true a very small—increase in mill cost, which left a margin of 4.62 cents for overhead expenses. Since 1925 that margin had never been less than ten cents except in 1932, when it was seven and a half cents. It is of course possible that the reduction in the price of ingot was accompanied by a corresponding drop in overhead; the record is silent; but it seems to us unreasonable to make that assumption: sudden changes of such magnitude are not to be expected. Rather we think that the plaintiff made out a prima facie case that "Alcoa" had been holding ingot at a price higher than a "fair price," and had reduced the price only because of pressure. If that was not so, it should have rebutted the inference.

In spite of this evidence the judge found that in these years "Alcoa" had not intended to monopolize the "sheet" market; or to exclude others; or to fix discriminatory prices, or prices of any kind; or to sell below the cost of production, measuring ingot price as part of the cost. The last of these findings presupposes that "Alcoa" could not have known the cost of "rolling sheet," for obviously it knew the prices at which "sheet" and ingot were selling. It says that it did not know, because the cost of "rolling sheet" varied from year to year, and could not be ascertained till the end of the year, so that it could never tell in advance what part of the gross "spread" between the "sheet" price and the ingot price would be left as profit. That is indeed hard to believe; but, assuming that it could not, since the judge so found, at least as early as 1930 the complaints charged it with notice of the effect

of what it was doing; and yet it kept on until the Department began to move, when it at once found means to cure the situation. Since we have not the question whether competitors were in fact damaged, but only whether there was enough evidence on which to base an injunction for the future, the only doubts are two: first, whether, when "Alcoa" came to know the effect of the "squeeze," as it did, the "squeeze" became unlawful; and second, whether the issue has become moot, which we will reserve until we come to discuss remedies. That it was unlawful to set the price of "sheet" so low and hold the price of ingot so high, seems to us unquestionable, provided, as we have held, that on this record the price of ingot must be regarded as higher than a "fair price." True, this was only a consequence of "Alcoa's" control over the price of ingot, and perhaps it ought not to be considered as a separate wrong; moreover, we do not use it as part of the reasoning by which we conclude that the monopoly was unlawful. But it was at least an unlawful exercise of "Alcoa's" power after it had been put on notice by the "sheet rollers'" complaints; and this is true, even though we assent to the judge's finding that it was not part of an attempt to monopolize the "sheet" market. We hold that at least in 1932 it had become a wrong.

■ The same considerations do not apply to "cable," of which "Alcoa" is the only fabricator. The plaintiff charges that "Alcoa" secured a monopoly of this by setting the price so low that there was no adequate "spread." That may be true, but aluminum "cable" must in any event compete with copper "cable," and the plaintiff failed to show that, even though the price of ingot were reduced so as to realize only a "fair" profit, it would have been possible to compete with copper "cable" and leave an adequate "spread" for "cable" fabricators. Complaints still continued after the "squeeze" in "sheet" had ended in 1933. The evidence permitted the conclusion that "Alcoa" may have had another intent in selling at a loss than to monopolize the market, or to suppress competition; and the finding was that it did. Such relief as the plaintiff can have, if any, upon this feature of the case, must therefore be limited to that against the monopoly in ingot.

### (3) The Piston Patent Situation.

■ The plaintiff charges "Alcoa" with three kinds of misuses of patents: (1) an unlawful limitation of the production of licensees of its own patents; (2) accepting a license agreement from another patentee that unlawfully limited its own production; (3) using its own patents to force the purchase of ingot upon licensees. The situation was somewhat complicated. In 1922 a number of persons owned fifty-three design patents for automobile pistons; and "Alcoa" owned forty-five such patents; it also owned some process patents for making pistons. All the design patents were put into a pool, and "Alcoa" was made the exclusive licensee of all with power to sublicense. It then issued sublicenses to three companies of all the patents, limiting the number of pistons which each licensee could make. The plaintiff argues that, although this limitation was lawful as to the design patents, it was not lawful as to the process patents, because such a limitation is a way of extending the monopoly. We need not pass upon that proposition, although the Sixth Circuit upheld it in Barber-Colman Co. v. National Tool Co., 6 Cir., 136 F.2d 339, refusing to follow our decision in Straight Side Basket Corporation v. Webster Basket Co., 2 Cir., 82 F.2d 245, which was to the contrary. The decisions of the Supreme Court plainly show an increasing tendency not to allow a patentee to make use of the sanctions which follow upon an unrestricted prohibition of the right to make, vend and use. Although even at common law a patentee was not allowed to attach any condition upon the resale of a patented product, made and sold by himself, he was free to limit the price at which a licensee might himself sell what the licensee made, and it is not apparent to us what difference there is between that, and setting a price upon, or limiting the quantities of, a process. However, the whole subject is plainly in flux, and we do not wish to pass upon it unless we have to do so. In the case at bar we do not, because, granting all that the plaintiff says, it did not prove, in the case of any of the sublicensees, that the pistons were not covered by the design patents, as well as by the process patents; and if the limitation was valid upon the design patents, it made no difference whether or not it was invalid upon the process patents.

■ The next charge arises from a transaction between the Bohn Aluminum and Brass Corporation and "Alcoa" in 1927. The Bohn company had a product patent for a "strut type" piston, which "Alcoa"

wished to make; and the Bohn company agreed to give "Alcoa" a license under this patent in exchange for "Alcoa's" license under the design and process patents. "Alcoa's" liability for royalties were to be computed as follows: it was not to pay any royalties, unless it made more than 5,-000,000 pistons of all sorts in any year; but, if it did, it was to pay a royalty upon the excess until it had paid upon all pistons made during that year under the Bohn patent. The plaintiff argues that it was unlawful for the Bohn company to license "Alcoa" under an agreement which exempted it from any royalties so long as it kept its total production of pistons below the stint, and that, if so, it was equally unlawful for "Alcoa" to submit to such a limitation upon its production. It is of course true that a patentee may not use his patent as a sanction for extending his monopoly beyond its terms; the cases cited by the plaintiff support that proposition. Standard Sanitary Manufacturing Co. v. United States, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107; National Harrow Co. v. Hench, 3 Cir., 83 F. 36, 39 L.R.A. 299; Blount Manufacturing Co. v. Yale & Towne Manufacturing Co., C.C.Mass., 166 F. 555; United States v. New Departure Co., D.C., 204 F. 107. Moreover, the agreement offered an inducement to "Alcoa" to limit its general production of pistons, since it would in this way avoid any royalties to Bohn. We will not say that that was not an unlawful extension of the Bohn company's monopoly, and conceivably if that company were a party to this action, we might enjoin further performance of the contract; though we could not do so in the absence of the patentee. However, the agreement was made in 1927, and any patent which it covered has now expired, and with it, of necessity, the contract. It might still be argued that "Alcoa" ought to be enjoined from entering into any other such arrangement; but the point has become trivial to the last degree and appears to be raised for the first time in this appeal. We refuse to consider it. Helvering v. Wood, 309 U.S. 344, 60 S.Ct. 551, 84 L.Ed. 796.

■ Finally, the plaintiff charges that in 1929 "Alcoa" and Aluminum Industries —one of the original three sublicensees of the pooled patents—agreed, as one of the considerations for its license, that the sublicensee should buy its ingot from "Alcoa." The theory here is that this was part of "Alcoa's" effort to monopolize the ingot industry. This would be an unlawful practice, if proved; but the judge decided that no such agreement had been made, and the evidence certainly admitted that conclusion. We find nothing in "Alcoa's" dealing with the piston patents which demands any change in the judgment.

This concludes all that we think it necessary to say about "Alcoa's" supposed unlawful practices. We have omitted consideration of any supposed conspiracy with foreign producers to protect its domestic monopoly, because it will be more convenient to deal with this as part of the organization of "Limited," and of "Alcoa's" use made of "Limited" both before and after 1931 when the "Alliance" was founded, as will appear. The plaintiff's position in general is that "Alcoa" was independently a party to such combinations until the advent of the "Alliance": we do not understand, however, that it asserts that this continued thereafter, except in so far as "Limited" is to be understood as always acting as "Alcoa's" agent or affiliate.

## III.

### "Limited."

"Limited" was incorporated in Canada on May 31, 1928, to take over those properties of "Alcoa" which were outside the United States. Only two were excepted: a Dutch company which owned bauxite deposits in Dutch Guiana; and a Canadian power transmission company, which supplied "Alcoa's" Massena plant. "Alcoa" also retained until 1931 an Italian company which it was using for experiments, and apparently for a few months forgot a small Norwegian power plant, which was transferred in October, 1928. For special reasons the Alcoa Power Company, which owned the Lower Development on the Saguenay, was not conveyed until 1938, although both parties meant from the first to include it, and indeed it would have been useless to any plant in the United States. In exchange for all the properties conveyed, "Limited" issued all its common shares to "Alcoa's" common shareholders in the proportion of one for every three; and it thus resulted that the beneficial ownership remained what it had been, except for the interest of "Alcoa's" preferred shareholders, who were apparently considered amply protected by the properties in the United States. At first there remained some officers common to both companies; but by the middle of 1931, this had ceased,

and, formally at any rate, the separation between the two companies was complete. At the conclusion of the transfers a majority, though only a bare majority, of the common shares of "Alcoa" was in the hands of three persons: Andrew W. Mellon, Richard B. Mellon, his brother, and Arthur V. Davis. Richard Mellon died in 1933, and Andrew in 1937, and their shares passed to their families; but in January, 1939, the Davises, the officers and directors of "Alcoa" and the Mellon families—eleven individuals in all—collectively still held 48.9 per cent of "Alcoa's" shares, and 48.5 per cent of "Limited's"; and Arthur V. Davis was then the largest shareholder in both companies.

The companies had a number of transactions with each other, upon which the plaintiff relies to prove that they did not deal at arms length, but that "Limited" was organized only as a creature of "Alcoa." As one instance, "Limited" apparently would have been able at times to sell aluminum in the United States at a profit but did not do so, because—the plaintiff argues—they had agreed not to compete. The inference is not strong: to break into a new market protected by a tariff subject to change, particularly a market for long in the possession of a single powerful producer, is a step which an outsider might well hesitate to take. Another supposed instance of cooperation is the manufacture of some of "Limited's" ore into alumina at the East St. Louis plant of "Alcoa" during the years 1928–1936. "Limited" had no alumina plant of its own—except one of an experimental nature—until the end of 1936; yet, although "Alcoa" did make all "Limited's" alumina until 1932, thereafter "Limited" bought a great deal from foreign manufacturers. Although "Alcoa" sold this alumina to "Limited" at a lower price than it billed alumina to its own aluminum plants, "Alcoa's" intramural accounts are without significance. "Alcoa" also did some fabrication for "Limited" from "Limited's" own aluminum, and did it at only mill cost without overhead. That substantially ended by 1931; but, while it lasted, it was confessedly a favor, and indeed for a short season "Alcoa" undoubtedly did cast a kindly eye upon its "fledgling", as Arthur V. Davis called it. "Alcoa" also bought three parcels of "Limited's" aluminum: the first two in 1929, and the last in February, 1938. The first were perhaps at a lower price than "Limited"

would otherwise have obtained, (the judge however found the prices were "fairly representative"); but they are not important, for they were both at the beginning of "Limited's" business, while there had as yet probably been little, if any, separation of interest between the two groups of shareholders. The third purchase was of quite a different character; it was part of the consideration for the conveyance to "Limited" of the Alcoa Power Company. In 1928 "Limited" was not able to pay for this property, although, as we have said, it always expected eventually to receive it. The price, as finally fixed in 1938, was $35,000,000, of which "Limited" was to pay $20,000,000 in mortgage bonds issued by the company itself, and the remainder in payments of two kinds: "Limited" was to pay "Alcoa" for power at a fixed rate, which should amount to at least $330,000 a year; and "Alcoa" was to have an option upon 75,000,000 pounds of aluminum, at thirteen cents, which was less than the market rate.

There was also some evidence that "Alcoa" took part in the formation of the "Alliance," a foreign "cartel" which we shall describe later. This consists very largely of declarations of Arthur V. Davis, put in his mouth by other witnesses; of a cable of Edward K. Davis to one of "Limited's" other officers; and of the improbability that the "Alliance" should have been set up without the active cooperation of Arthur V. Davis, especially as he was concededly in Europe and in communication with some foreign producers at about the time that the "Alliance" was first bruited. Edward K. Davis was the originator of the "Alliance"; he gave as his reason for it that he feared that the other foreign producers who had already joined in a "cartel," would shut him out. When these producers came to Canada in 1931 to arrange for the "Alliance," they visited Arthur V. Davis and made an extended visit to "Alcoa's" plants in the East. As anticipatory confirmation that the "Alcoa" had had a share in forming the "Alliance," the plaintiff also introduced evidence to show that before 1928 "Alcoa" had already had an understanding with foreigners as to prices. This consisted largely of the statements of what others had said about an agreement to keep their prices the same as "Alcoa's." The plaintiff rested particularly upon the testimony of Haskell, (who testified, not only upon this point, but more generally),

because, when Haskell testified, although he had been one of the important figures in the Baush company, he had made his peace with "Alcoa" which had employed him in some advisory capacity. It must be remembered, however, that he had already testified in the action of the Baush company against "Alcoa," and that he could scarcely have repudiated what he then said.

The Davises in answer to all this evidence swore that "Limited" had been organized for three reasons, quite different from controlling prices in the United States. First, there was at that time a growing nationalism in the British Empire —where "Alcoa" sold most of its foreign aluminum—which manifested itself in the slogan: "Buy British," and which would be better satisfied, if the properties were owned by a Canadian corporation, even though its shareholders were American. Next, "Alcoa" had neglected its foreign properties—relatively—and they would better prosper under a management, singly devoted to them. Finally, the time was coming when Arthur V. Davis wished to take a less active part in affairs; and there would be embarrassment in choosing between Hunt and Edward K. Davis, as his successor. Both said that the separation between the companies had been actually as complete as it was in form. Arthur said that, although while in Europe shortly before the "Alliance" was formed, foreign producers had spoken to him, he had then and always referred all their inquiries to his brother. He had discussed little with Edward any questions of policy about "Limited"; they had talked for the most part only about the history, development and future of the properties. He had indeed seen a preliminary draft of the agreement, forming the "Alliance," but not its final form until the time of the trial; and he had had nothing whatever to do with its formation. As for the trip of the foreign producers in the United States, it was purely social; a "good-will" excursion, so to say, in which the relations of "Alcoa" and foreign production was not discussed.

Upon the whole evidence the judge found that by 1935 "Limited" had become altogether free from any connection with "Alcoa," and that "Alcoa" had had no part in forming the "Alliance," or in any effort at any time to limit imports, to fix their price, or to intervene in price fixing "cartels" in Europe—except the early ones. In short, he again felt persuaded by the testimony against any inferences to be drawn from the conceded facts, and from the declarations put in the mouths of the Davises. As before, to do otherwise he would have had to find that both these men had deliberately perjured themselves; and we cannot see that these findings present us with anything different in substance from those on which we have already passed. Considering the interests in "Limited" which Arthur V. Davis and both the Mellons had, it would perhaps have taxed our credulity to the breaking point to believe that they knew nothing about the formation of the "Alliance." Arthur V. Davis did not go as far as that; and that he and the Mellons should have put into the hands of Edward K. Davis the whole management of "Limited," does not appear to us to pass the bounds of reasonable entertainment. "Alcoa" had had collisions in plenty with the plaintiff and others before 1931; the first Baush action, which challenged the "price squeeze," had been filed in April, 1928, and the second in July, 1931. It was not unreasonable to believe that Arthur V. Davis and the Mellons, seeing that some kind of "cartel" might be an inescapable incident to continuing business abroad, wished in 1931 to keep "Alcoa" as far removed from it as possible.

Even so, the question remains whether "Alcoa" should be charged with the "Alliance" because a majority of its shareholders were also a majority of "Limited's" shareholders; or whether that would be true, even though there were a group, common to both, less than a majority, but large enough for practical purposes to control each. It is quite true that in proportion as courts disregard the fictitious persona of a corporation—as perhaps they are increasingly disposed to do—they must substitute the concept of a group of persons acting in concert. Nevertheless, the group must not be committed legally except in so far as they have assented as a body, and that assent should be imputed to them only in harmony with the ordinary notions of delegated power. The plaintiff did not prove that in 1931, to say nothing of 1936, there was not a substantial minority in each company made up of those who held no shares in the other; and the existence of the same majority in the two corporations was not enough by itself to identify the two. "Alcoa" would not be bound, unless those who held the majority of its

shares had been authorized by the group as a whole to enter into the "Alliance"; and considering the fact that, as we shall show, it was an illegal arrangement, such an authority ought convincingly to appear. It does not appear at all. For support of this proposition we need look no further than to the decisions of the Supreme Court under the "Commodity Clause." United States v. Delaware & Hudson Co., 213 U. S. 366, 29 S.Ct. 527, 53 L.Ed. 836; United States v. Lehigh Valley R. Co., 220 U.S. 257, 31 S.Ct. 387, 55 L.Ed. 458; United States v. Delaware, Lackawanna & Western R., 238 U.S. 516, 35 S.Ct. 873, 59 L. Ed. 1438; United States v. Reading Co., 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760; United States v. Lehigh Valley R. Co., 254 U.S. 255, 41 S.Ct. 104, 65 L.Ed. 253; United States v. Elgin, Joliet & Eastern R. Co., 298 U.S. 492, 56 S.Ct. 841, 80 L.Ed. 1300. There was in all these cases strong reason to hold that the railroads had an "indirect" interest in the coal moved, yet the decisions uniformly assumed that the ownership, not of a majority of the shares, but even of all the shares, did not make the corporations coalesce. Except when there was evidence that those in nominal control of one of the two corporations, exercised no independent decision, but followed the directions of the other, they were treated as juridically separate. Indeed, were it not so, a minority of shareholders would always be compelled to see to it that a majority—perhaps even a controlling fraction —of the shares did not pass to a confederated group who had a similar control over another corporation. For these reasons we conclude that "Alcoa" was not a party to the "Alliance," and did not join in any violation of § 1 of the Act, so far as concerned foreign commerce.

Whether "Limited" itself violated that section depends upon the character of the "Alliance." It was a Swiss corporation, created in pursuance of an agreement entered into on July 3, 1931, the signatories to which were a French corporation, two German, one Swiss, a British, and "Limited." The original agreement, or "cartel," provided for the formation of a corporation in Switzerland which should issue shares, to be taken up by the signatories. This corporation was from time to time to fix a quota of production for each share, and each shareholder was to be limited to the quantity measured by the number of shares it held, but was free to sell at any

price it chose. The corporation fixed a price every year at which it would take off any shareholder's hands any part of its quota which it did not sell. No shareholder was to "buy, borrow, fabricate or sell" aluminum produced by anyone not a shareholder except with the consent of the board of governors, but that must not be "unreasonably withheld." Nothing was said as to whether the arrangement extended to sales in the United States; but Article X, known as the "Conversion Clause," provided that any shareholder might exceed his quota to the extent that he converted into aluminum in the United States or Canada any ores delivered to him in either of those countries by persons situated in the United States. This was confessedly put in to allow "Limited" to receive bauxite or alumina from "Alcoa," to smelt it into aluminum and to deliver the aluminum to "Alcoa." Edward K. Davis gave as an explanation of this that "Limited" needed some protection against "Alcoa's" possible refusal to convey Alcoa Power Company, which "Alcoa" had never actually bound itself to transfer. Although in 1931 "Alcoa" had all the producing capacity which it seemed likely to need (and so the event proved, for the clause was never invoked), Davis said that he did not know whether in the future the demand might not outrun that capacity, and whether "Alcoa" might not therefore be tempted to hold onto the Lower Development, unless "Limited" would smelt its alumina. That does indeed seem a somewhat farfetched reason; but on the other hand it is hard to suppose that "Alcoa" really feared that it could not meet its future needs and meant to lean upon "Limited." The incident may be thought to have a bearing on "Alcoa's" implication in the "Alliance"; but its only substantial importance, so far as we can see, is as showing whether the 1931 agreement was intended to cover the United States. That question arose very shortly after the agreement was made, and Edward K. Davis took the position that the United States was included, relying upon absence of any exception in the general language. His interpretation would seem to have been plainly right, not only for the reason he gave, but because otherwise there would have been no occasion for the "Conversion Clause." However, the other shareholders overruled him, and until 1936, when the new arrangement was made, imports into the United States

were not included in the quotas. The issue turned out to be unimportant anyway, for the annual average of imports during the five years was in the neighborhood of only fifteen million pounds.

The agreement of 1936 abandoned the system of unconditional quotas, and substituted a system of royalties. Each shareholder was to have a fixed free quota for every share it held, but as its production exceeded the sum of its quotas, it was to pay a royalty, graduated progressively in proportion to the excess; and these royalties the "Alliance" divided among the shareholders in proportion to their shares. This agreement—unlike the first—did not contain an express promise that the "Alliance" would buy any undisposed of stocks at a fixed price, although perhaps § 3 of Subdivision A, of Part X may have impliedly recognized such an obligation. Probably, during the two years in which the shareholders operated under this agreement, that question did not arise for the demand for aluminum was very active. Nevertheless, we understand from "Limited's" answer to an interrogatory that the last price fixed under the agreement of 1931 was understood to remain in force. Although this agreement, like its predecessor, was silent as to imports into the United States, when that question arose during its preparation, as it did, all the shareholders agreed that such imports should be included in the quotas. The German companies were exempted from royalties—for obvious reasons—and that, it would seem, for practical purposes put them out of the "cartel" for the future, for it was scarcely possible that a German producer would be unable to dispose of all its production, at least within any future period that would be provided for. The shareholders continued this agreement unchanged until the end of March, 1938, by which time it had become plain that, at least for the time being, it was no longer of service to anyone. Nothing was, however, done to end it, although the German shareholders of course became enemies of the French, British and Canadian shareholders in 1939. The "Alliance" itself has apparently never been dissolved; and indeed it appeared on the "Proclaimed List of Blocked Nationals" of September 13, 1944.

 Did either the agreement of 1931 or that of 1936 violate § 1 of the Act? The answer does not depend upon whether we shall recognize as a source of liability a liability imposed by another state. On the contrary we are concerned only with whether Congress chose to attach liability to the conduct outside the United States of persons not in allegiance to it. That being so, the only question open is whether Congress intended to impose the liability, and whether our own Constitution permitted it to do so: as a court of the United States, we cannot look beyond our own law. Nevertheless, it is quite true that we are not to read general words, such as those in this Act, without regard to the limitations customarily observed by nations upon the exercise of their powers; limitations which generally correspond to those fixed by the "Conflict of Laws." We should not impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequences within the United States. American Banana Co. v. United Fruit Co., 213 U.S. 347, 357, 29 S.Ct. 511, 53 L.Ed. 826, 16 Ann.Cas. 1047; United States v. Bowman, 260 U.S. 94, 98, 43 S. Ct. 39, 67 L.Ed. 149; Blackmer v. United States, 284 U.S. 421, 437, 52 S.Ct. 252, 76 L.Ed. 375. On the other hand, it is settled law—as "Limited" itself agrees—that any state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders that has consequences within its borders which the state reprehends; and these liabilities other states will ordinarily recognize. Strassheim v. Daily, 221 U.S. 280, 284, 285, 31 S.Ct. 558, 55 L.Ed. 735; Lamar v. United States, 240 U.S. 60, 65, 66, 36 S.Ct. 255, 60 L.Ed. 526; Ford v. United States, 273 U.S. 593, 620, 621, 47 S.Ct. 531, 71 L.Ed. 793; Restatement of Conflict of Laws § 65. It may be argued that this Act extends further. Two situations are possible. There may be agreements made beyond our borders not intended to affect imports, which do affect them, or which affect exports. Almost any limitation of the supply of goods in Europe, for example, or in South America, may have repercussions in the United States if there is trade between the two. Yet when one considers the international complications likely to arise from an effort in this country to treat such agreements as unlawful, it is safe to assume that Congress certainly did not intend the Act to cover them. Such agreements may on the other hand intend to include imports into the United States, and yet it may appear that they have had no effect upon them. That situation might be thought to

fall within the doctrine that intent may be a substitute for performance in the case of a contract made within the United States; or it might be thought to fall within the doctrine that a statute should not be interpreted to cover acts abroad which have no consequence here. We shall not choose between these alternatives; but for argument we shall assume that the Act does not cover agreements, even though intended to affect imports or exports, unless its performance is shown actually to have had some effect upon them. Where both conditions are satisfied, the situation certainly falls within such decisions as United States v. Pacific & Artic R. & Navigation Co., 228 U.S. 87, 33 S.Ct. 443, 57 L.Ed. 742; Thomsen v. Cayser, 243 U.S. 66, 37 S.Ct. 353, 61 L.Ed. 597, Ann.Cas.1917D, 322 and United States v. Sisal Sales Corporation, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042. (United States v. Nord Deutcher Lloyd, 223 U.S. 512, 32 S.Ct. 244, 56 L.Ed. 531, illustrates the same conception in another field.) It is true that in those cases the persons held liable had sent agents into the United States to perform part of the agreement; but an agent is merely an animate means of executing his principal's purposes, and, for the purposes of this case, he does not differ from an inanimate means; besides, only human agents can import and sell ingot.

█ Both agreements would clearly have been unlawful, had they been made within the United States; and it follows from what we have just said that both were unlawful, though made abroad, if they were intended to affect imports and did affect them. Since the shareholders almost at once agreed that the agreement of 1931 should not cover imports, we may ignore it and confine our discussion to that of 1936: indeed that we should have to do anyway, since it superseded the earlier agreement. The judge found that it was not the purpose of the agreement to "suppress or restrain the exportation of aluminum to the United States for sale in competition with "Alcoa." By that we understand that he meant that the agreement was not specifically directed to "Alcoa," because it only applied generally to the production of the shareholders. If he meant that it was not expected that the general restriction upon production would have an effect upon imports, we cannot agree, for the change made in 1936 was deliberate and was expressly made to accomplish just that. It would have been an idle gesture, unless the shareholders had supposed that it would, or at least might, have that effect. The first of the conditions which we mentioned was therefore satisfied; the intent was to set up a quota system for imports.

█ The judge also found that the 1936 agreement did not "materially affect the * * * foreign trade or commerce of the United States"; apparently because the imported ingot was greater in 1936 and 1937 than in earlier years. We cannot accept this finding, based as it was upon the fact that, in 1936, 1937 and the first quarter of 1938, the gross imports of ingot increased. It by no means follows from such an increase that the agreement did not restrict imports; and incidentally it so happens that in those years such inference as is possible at all, leads to the opposite conclusion. It is true that the average imports—including "Alcoa's"—for the years 1932–1935 inclusive were about 15 million pounds, and that for 1936, 1937 and one-fourth of 1938 they were about 33 million pounds; but the average domestic ingot manufacture in the first period was about 96 million and in the second about 262 million; so that the proportion of imports to domestic ingot was about 15.6 per cent for the first period and about 12.6 per cent for the second. We do not mean to infer from this that the quota system of 1936 did in fact restrain imports, as these figures might suggest; but we do mean that nothing is to be inferred from the gross increase of imports. We shall dispose of the matter therefore upon the assumption that, although the shareholders intended to restrict imports, it does not appear whether in fact they did so. Upon our hypothesis the plaintiff would therefore fail, if it carried the burden of proof upon this issue as upon others. We think, however, that, after the intent to affect imports was proved, the burden of proof shifted to "Limited." In the first place a depressant upon production which applies generally may be assumed, ceteris paribus, to distribute its effect evenly upon all markets. Again, when the parties took the trouble specifically to make the depressant apply to a given market, there is reason to suppose that they expected that it would have some effect, which it could have only by lessening what would otherwise have been imported. If the motive they introduced was over-balanced in all instances by mo-

tives which induced the shareholders to import, if the United States market became so attractive that the royalties did not count at all and their expectations were in fact defeated, they to whom the facts were more accessible than to the plaintiff ought to prove it, for a prima facie case had been made. Moreover, there is an especial propriety in demanding this of "Limited," because it was "Limited" which procured the inclusion in the agreement of 1936 of imports in the quotas.

■ There remains only the question whether this assumed restriction had any influence upon prices, Apex Hosiery Co. v. Leader, supra, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044. To that Socony-Vacuum Oil Co. v. United States, supra, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, is an entire answer. It will be remembered that, when the defendants in that case protested that the prosecution had not proved that the "distress" gasoline had affected prices, the court answered that that was not necessary, because an agreement to withdraw any substantial part of the supply from a market would, if carried out, have some effect upon prices, and was as unlawful as an agreement expressly to fix prices. The underlying doctrine was that all factors which contribute to determine prices, must be kept free to operate unhampered by agreements. For these reasons we think that the agreement of 1936 violated § 1 of the Act.

## IV.

### The Remedies.

Nearly five years have passed since the evidence was closed; during that time the aluminum industry, like most other industries, has been revolutionized by the nation's efforts in a great crisis. That alone would make it impossible to dispose of the action upon the basis of the record as we have it; and so both sides agree; both appeal to us to take "judicial notice" of what has taken place meanwhile, though they differ as to what should be the result. The plaintiff wishes us to enter a judgment that "Alcoa" shall be dissolved, and that we shall direct it presently to submit a plan, whose execution, however, is to be deferred until after the war. It also asks a termination of all shareholding in common between "Alcoa" and "Limited"; and that injunctions shall go against any resumption of the putative unlawful practices. On the other hand, "Alcoa" argues

that, when we look at the changes that have taken place—particularly the enormous capacity of plaintiff's aluminum plants—it appears that, even though we should conclude that it had "monopolized" the ingot industry up to 1941, the plaintiff now has in its hands the means to prevent any possible "monopolization" of the industry after the war, which it may use as it wills; and that the occasion has therefore passed forever which might call for, or justify, a dissolution: the litigation has become moot. "Limited" on its part argues that, so far as concerns the "Alliance"—the only practice which we are holding unlawful—the war has killed it forever; and, more particularly, that the decision in United States v. Hamburg-Amerikanische Packet-Fahrt, 239 U.S. 466, 36 S.Ct. 212, 60 L.Ed. 387, is on all fours. We do not agree with either side; but, before giving our reasons, we must determine for what purposes we may look outside the record.

■ Both sides agree that the judgment in this action should speak from the time of its entry, like a decree upon an old bill in equity (indeed, until the advent of the New Rules, the action would have been a "suit in equity," though the "bill" was until then more properly described as a "petition" and the plaintiff as a "petitioner"). There is no reason why an appellate court upon deciding an appeal from such a judgment should not direct the district court what judgment to enter; and so it often does. Nor is there any reason why in deciding what judgment to direct, it should not advise itself from outside the record of such facts as appear to admit of no genuine dispute: i.e. should take "notice" of whatever the district court itself might take "notice." Indeed, it would otherwise be impossible for an appellate court ever to dismiss an action upon the ground that it had become moot. We may, and we do, accept the figures of aluminum production in the report of the so-called "Truman Committee" as of March, 1944, which showed that the annual production of "Alcoa's" plants was about 828 million pounds; that the production of plants owned by the plaintiff which it had leased to "Alcoa," was about 1293 million pounds; and that the production of the Reynolds and Olin plants was together, 202 million pounds: a total of about 2300 million pounds. The case is otherwise as to any facts already existing in August, 1940, such as the

amount of bauxite in Arkansas, as to which the "Truman Report" also contains figures. Even though we took "notice" of these, the report would not be conclusive, or more than evidence. We could not constitutionally substitute it for the findings of a court after a trial: facts which a court may judicially "notice" do not for that reason become indisputable. Wigmore, § 2567a. At most we could do no more than treat the report as newly discovered evidence, and send the issue back for another trial, which in the present case we should under no circumstances be willing to do. For these reasons we refuse to take "notice" of facts relevant to the correctness of the findings; but we do take "notice" of those relevant to remedies.

■ After doing so, it is impossible to say what will be "Alcoa's" position in the industry after the war. The plaintiff has leased to it all its new plants and the leases do not expire until 1947 and 1948, though they may be surrendered earlier. No one can now forecast in the remotest way what will be the form of the industry after the plaintiff has disposed of these plants, upon their surrender. It may be able to transfer all of them to persons who can effectively compete with "Alcoa"; it may be able to transfer some; conceivably, it may be unable to dispose of any. The measure of its success will be at least one condition upon the propriety of dissolution, and upon the form which it should take, if there is to be any. It is as idle for the plaintiff to assume that dissolution will be proper, as it is for "Alcoa" to assume that it will not be; and it would be particularly fatuous to prepare a plan now, even if we could be sure that eventually some form of dissolution will be proper. Dissolution is not a penalty but a remedy; if the industry will not need it for its protection, it will be a disservice to break up an aggregation which has for so long demonstrated its efficiency. The need for such a remedy will be for the district court in the first instance, and there is a peculiar propriety in our saying nothing to control its decision, because the appeal from any judgment which it may enter, will perhaps be justiciable only by the Supreme Court, if there are then six justices qualified to sit.

■ But there is another, and even more persuasive, reason why we should not now adjudge a dissolution of any kind. The Surplus Property Act of 1944 provides the method by which the plaintiff's "surplus" properties shall be disposed of: "aluminum plants and facilities" among the rest, § 19(a) (1). The "Surplus Property Board," § 5(a), is to "designate one or more Government agencies to act as disposal agencies," § 10(a), and they are to "have responsibility and authority for the disposition of such property and for the care and handling of such property, pending its disposition," § 11(d), subject to the Board's regulations. These "agencies" may dispose of the properties "by sale, exchange, lease, or transfer, for cash, credit, or other property, with or without warranty, and upon such other terms and conditions, as the agency deems proper" § 15(a). The following, among other "objectives," are to "regulate the orderly disposal of surplus property": "(b) to give maximum aid in the reestablishment of a peacetime economy of free independent private enterprise"; "(d) to discourage monopolistic practices and to strengthen and preserve the competitive position of small business concerns in an economy of free enterprise"; "(p) to foster the development of new independent enterprise"; "(r) to dispose of surplus property as promptly as feasible without fostering monopoly or restraint of trade * * *." So far as consistent "with the usual and customary commercial practice" preference is to be given to smaller purchasers, § 18(b); to whom, when proper, money may be lent § 18(f). Finally, no "disposal agency" shall even "begin negotiations" to sell a plant which has cost over a million dollars without advising the Attorney General of "the probable terms or conditions" of the sale; and he in turn must tell the "agency" whether "the proposed disposition will violate the antitrust laws." The act must not be read to "impair, amend, or modify" those laws, or to "prevent their application" to purchasers of surplus property. In view of these declarations of the purpose of Congress, the "agency" which the Board "designates" to dispose of the plaintiff's "aluminum plants and facilities" may well believe that it cannot do so without some plan or design for the industry as a whole, some comprehensive model which shall, so far as practicable, re-establish "free independent private enterprise," "discourage" monopoly, "strengthen" small competitors, "foster" independents and not foster "monopoly or restraint of trade." If it should find this method desirable, it would have to

learn what purchasers were in the market, how strong they were, what units they could finance and operate, and in what position they would be to compete. In such a model or design the "agency" would have to assign a place to "Alcoa," and that place no one of course can now anticipate. Conceivably "Alcoa" might be left as it was; perhaps it might have to be dissolved; if dissolved, the dissolution would depend upon how the other plants were distributed. If the "agency" should find it wise to proceed in this way, it may succeed in inducing "Alcoa" to accept the place assigned to it, particularly if the plan has not been prepared ex parte. If it does not succeed, then, but then only, will it be appropriate for the district court to act. We do not of course mean that in deciding whether to dissolve "Alcoa," or how to do it, that court must be governed by any plan which the "agency" may have devised, if it does devise one. But, plan or no plan, it must wait until it learns what the "agency" has in fact done. Moreover, if the "agency" does form a plan, it will have been an attempt to realize the same "objectives" for which the court itself must strive; and the court may well feel that it should accord to the "agency's" plan that presumptive validity which courts are properly coming more and more to recognize in the decisions of specialized tribunals. Nothing which we now say ought in any measure to limit the discretion of the "agency" to proceed in this way. Therefore we shall merely reverse the judgment, so far as it held that "Alcoa" was not "monopolizing" the ingot market, and remand the case to the district court.

▇▇▇▇ From what we have already said, we must deny the plaintiff's prayer that those shareholders who own shares in both "Alcoa" and "Limited," shall dispose of one or the other. Since we have affirmed all the findings as to unlawful practices except the "price squeeze," again it follows that no injunction will go as to these. As to the "price squeeze" itself, "Alcoa" insists that, even if it was unlawful, it has been discontinued now for twelve years, and that there is no likelihood that it will ever be resumed. "Alcoa" might add that, since there can be no "squeeze" if "sheet rollers" can buy ingot at competitive prices, there can be no need of an injunction, if that privilege is assured to them; and that, since it will be assured to them when the final judgment

is entered, an injunction would only bring coals to Newcastle. We defer for the moment any general discussion as to when abandonment of a practice ought to bar an injunction, for we shall have to consider it more specifically in the case of "Limited." It is enough here to say that, since "Alcoa" abandoned the "squeeze" only after it became aware that it was under investigation, it is in no position now to complain of whatever stigma there may be in an injunction; in such a setting there is no place for sensibilities; nor should lapse of time secure immunity. More can be said for the argument that "Alcoa" will be unable to "squeeze" at all, if it loses its monopoly; but no one can be sure how the industry may change, and it is impossible to say that the same practice may not in the future commend itself to those who may come into control; and at any rate there can be no injustice in making assurance doubly sure. An injunction will go against any resumption of the "price squeeze"; the terms to be decided by the district court.

Unless the issue has become moot, "Limited" also must be enjoined from entering into any "cartel," or agreement like that of 1936, covering imports into the United States; and even though it had become moot we should have to reverse the judgment, though we should then dismiss the complaint without prejudice, as in United States v. Hamburg-Amerikanische Packet-Fahrt, supra, 239 U.S. 466, 36 S.Ct. 212, 60 L.Ed. 387. We think, however, that the issue has not become moot, and that there are vital distinctions between the situation before us and that then before the Supreme Court. A number of steamship lines had there agreed to apportion between them the carriage of steerage passengers upon a non-competitive basis. Two or three of the lines were German, and the agreement was to end in any event on December 3, 1915. Moreover, it provided that "the withdrawal of any one of the lines from the contract should release all others from all future obligation unless the others agreed among themselves to continue," 239 U.S. at page 472, 36 S.Ct. 215. The decision was rendered on January 10, 1916, after the contract had come to an end, and after war had been waged for over a year between Germany and the Allies. The court treated the last circumstance as putting an end to the contract which certainly it did, so far as concerned

the German lines. As between the other parties the contract was also terminated, if the exclusion of the Germans because of the war was a "withdrawal from the contract," as it should have been regarded. Besides, the contract was of such a kind that the exclusion of the German lines probably made impossible the realization of its purposes in any part; for the traffic divided was only between European ports and the United States and Canada, and it would scarcely have value to any of the parties unless all the large lines joined.

The agreement of 1936 on the other hand, was to last for 99 years, though it could be terminated on six months' notice by any shareholder who held 200 shares, and all held as many as 200. As we have seen, the two German smelters had been exempted from royalties; and it is not altogether clear what future part remained for them in the enterprise, although some past obligations were compromised. It is true that some eighteen months before war was declared the other shareholders ceased to perform the agreement, but no one ever gave the prescribed notice of dissolution and, formally at least, the agreement continued and still continues. Indeed, it is possible that all but the German shareholders can start up the system again without renewal, if they please. The only doubt is whether the termination of the Germans' connection by the war automatically put an end to the agreement as between the others; and at least a strong argument can be made, in view of the provision for dissolution by notice, that it was not to be dissolved by the mere withdrawal of shareholders, certainly of shareholders who were not within the quota and did not share the royalties. Finally, the two situations differ in the fact that the "Alliance" itself, as a corporation, still persists, and all the original shareholders presumably remain such. The mere cessation of an unlawful activity before suit does not deprive the court of jurisdiction to provide against its resumption; a "case or controversy" may remain to be disposed of. There are plentiful authorities so holding. Southern Pacific T. Co. v. Interstate Commerce Commission, 219 U.S. 498, 514-516, 31 S.Ct. 279, 55 L.Ed. 310; Goshen Manufacturing Co. v. Myers Manufacturing Co., 242 U.S. 202, 37 S.Ct. 105, 61 L.Ed. 248; National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831,

115 A.L.R. 307; Federal Trade Commission v. Goodyear Co., 304 U.S. 257, 260, 58 S.Ct. 863, 82 L.Ed. 1326; Walling v. Haile Gold Mines, 4 Cir., 136 F.2d 102, 105. To disarm the court it must appear that there is no reasonable expectation that the wrong will be repeated. That is not true in the case at bar. Unless we are to grant an injunction, we ought not pass upon the issue; if we do not pass upon the issue, we are by no means persuaded that "Limited," when peace comes, will not enter into another "cartel" which again attempts to restrict imports. It has insistently argued that the Act does not cover such an agreement; and it alleges that it was forced into the "cartel," if it was to do a European business at all. It may be forced to do so again, unless a judgment forbids.

The judgment dismissing the complaint against the Goods Company will stand. The injunctions granted will embrace the officers of those corporate defendants against which they run.

Judgment reversed, and cause remanded for further proceedings not inconsistent with the foregoing.