POLICY MANAGEMENT SYSTEMS
CORPORATION, Petitioner,

v.

INDIANA DEPARTMENT OF STATE
REVENUE, Respondent.

Nos. 49T10–9705–TA–00151,
49T10–9705–TA–00152.

Tax Court of Indiana.

Nov. 10, 1999.

Padric Kelly O'Brien, Indianapolis, Indiana, Allen V. Doty, Policy Management Services Corporation, Columbia, South Carolina, Attorneys for Petitioner.

Jeffrey A. Modisett, Attorney General of Indiana, Vincent S. Mirkov, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Respondent.

## FISHER, J.

Petitioner Policy Management Systems Corporation (PMSC) challenges the final determination of the Indiana Department of State Revenue (Department) finding that PMSC owed certain gross income taxes for the tax years ending December 31, 1986, 1987 and 1988.[1] Petitioner presents the following issue for the Court's consideration: whether amounts PMSC received from customers as reimbursements for advances PMSC made on behalf of its customers to various state agencies in order to obtain motor vehicle reports (MVRs) were subject to the state's gross income tax under IND.CODE ANN. § 6–2.1–2–2 (West 1989).

### FACTS AND PROCEDURAL HISTORY

PMSC is incorporated under the laws of South Carolina and maintains its principle offices in South Carolina. During the tax periods in question, PMSC also maintained a service bureau in Indianapolis. PMSC engages in the business of providing goods, information and services to insurance companies. As one of its services, PMSC retrieves MVRs and transmits them to customers.[2] The MVR is a confi-

1. This cause was consolidated with cause number 49T10–9705–TA–152 by order of this Court dated September 5, 1997. For the tax year ending December 31, 1986, PMSC is acting as the successor in interest to Commercial Services, Inc. (Commercial). Commercial was a separate entity performing the same MVR retrieval functions under consideration. PMSC acquired Commercial's stock on December 19, 1985. On December 31, 1986, under applicable state corporate law, Commercial merged with and into PMSC, at

which time PMSC "assumed all liability of [Commercial] and acquired all right and interest held by [Commercial]." (Stipulation of Facts ¶ 2.) PMSC's status as the successor in interest to Commercial does not substantively affect the Court's opinion.

2. As described by PMSC, it "employed a nationwide MVR retrieval system which linked MVR agencies, [PMSC] and its casualty insurance-clients through telecommunication facilities supplied by common carriers." (Pet. for

dential history of accidents, operating violations and other information maintained by a state government agency for each individual licensed as a motor vehicle operator by that agency. Individual agencies determine the means by which PMSC or its agents may obtain an MVR and the fee amount charged by the agency for providing the requested information. PMSC does not retain a copy of any MVR. Per written contracts, customers pay PMSC a fixed fee for each MVR obtained. Customers also agree to reimburse PMSC the cost of assessments by government agencies incurred by PMSC in retrieving the information. PMSC invoices its clients monthly, separately stating the amounts of fee income and agency assessments for MVR activity during the billing period.

Following audits of PMSC's corporate income taxes, the Department in November of 1992 issued notices of proposed assessment stating that PMSC owed $534,-312.71 in taxes, penalties and interest. The Department conducted a supplemental audit of PMSC's corporate income taxes in 1993. PMSC protested the proposed assessments, and the Department conducted a hearing regarding the proposed assessments on February 23, 1996. On November 19, 1996, the Department issued Letters of Findings denying the protests with regard to PMSC's tax liability but sustaining the protests with regard to the penalties imposed against PMSC. In January of 1997, the Department notified PMSC that it owed $86,670 in gross income taxes and $66,053.53 in interest.[3] PMSC filed its petitions for original tax appeals on May 15, 1997. The Court conducted a trial in this matter on March 3, 1998 and heard oral arguments by the parties on August 13, 1998. Additional facts will be supplied where necessary.

Original Tax Appeal ¶ 6(b)(2).) The Indianapolis service bureau processed MVRs for approximately seven or eight states. (Trial Tr. at 57.)

## ANALYSIS AND OPINION

### Standard of review

■ On appeal, the Court reviews final determinations by the Department de novo. *See* IND.CODE ANN. § 6–8.1–5–1(h) (West Supp.1999); *Cooper Indus., Inc. v. Indiana Dep't of State Revenue*, 673 N.E.2d 1209, 1211 (Ind.Tax Ct.1996). The Court is bound neither by the issues presented nor by the evidence adduced at the administrative level. *See Cooper*, 673 N.E.2d at 1211.

### Discussion

■ PMSC claims that the reimbursements it received from customers for payment of assessments by individual state agencies for MVRs do not constitute taxable gross income. PMSC contends that it functioned as its customers' agent when requesting and paying for MVRs from agencies. According to PMSC, the reimbursements constituted recovery of payments to third parties made on behalf of and with the consent of its customers. PMSC essentially argues that there was no receipt of gross income, because PMSC lacked a beneficial interest in the reimbursements.

Indiana's gross income tax is imposed by IND.CODE ANN. § 6–2.1–2–2 (West 1989), which provides:

(a) An income tax, known as the gross income tax, is imposed upon the receipt of:

(1) the entire taxable gross income of a taxpayer who is a resident or a domiciliary of Indiana; and

(2) the taxable gross income derived from activities or businesses or any other sources within Indiana by a taxpayer who is not a resident or a domiciliary of Indiana.

3. The parties have stipulated that the Department proposes to assess PMSC $86,670 in corporate income taxes for the 1986–1988 tax periods. (Stipulation of Facts ¶ 3.)

The term "gross income" has a broad definition, including, among other things, "the gross receipts a taxpayer receives ... from trades, businesses, or commerce ... [and] from any other source not specifically described in this subsection." IND.CODE ANN. § 6–2.1–1–2(a) (West 1989). "Taxable gross income" is "the remainder of: (1) all gross income which is not exempt from tax under IC 6–2.1–3; less (2) all deductions which are allowed under IC 6–2.1–4." *Id.* § 6–2.1–1–13. "Receipts," as applied to taxpayers, means "the gross income in cash ... or other property that is received by the taxpayer or a third party for the taxpayer's benefit." *Id.* § 6–2.1–1–10 (amended 1997). Further, a taxpayer "receives" gross income upon "(1) the actual coming into possession of, or the crediting to, the taxpayer, of gross income; or (2) the payment of a taxpayer's expenses, debts, or other obligations by a third party for the taxpayer's direct benefit." *Id.* § 6–2.1–1–11. The Court has previously recognized that "the taxpayer's beneficial interest in income is central to the receipt of gross income." *Universal Group Ltd. v. Indiana Dep't of State Revenue,* 609 N.E.2d 48, 50 (Ind.Tax Ct.1993) (*UGL I*), *supplemented by,* 634 N.E.2d 891 (Ind.Tax Ct.1994) (*UGL II*), *opinion on reh'g,* 642 N.E.2d 553 (Ind.Tax Ct.1994) (*UGL III*) (affirming judgment but vacating opinion in *UGL II*).

PMSC asserts that it was the agent for its customers, the purported principals, in processing MRVs. "[R]eimbursements to an agent for amounts advanced or paid to third parties substantively represent 'pass throughs' of income and therefore are not taxable to the agent." *UGL I,* 609 N.E.2d at 54. In contrast, "reimbursements of a taxpayer's own expenses are receipts of gross income to the taxpayer...." *Id.* The Department's regu-

lations recognize the non-taxability of agents' receipts. INDIANA ADMIN.CODE tit. 45, r. 1–1–54 (1988) provides in part:

> Taxpayers are not subject to gross income tax on income they receive in an agency capacity. However, before a taxpayer may deduct such income in computing his taxable gross receipts, he must meet two (2) requirements:
>
> (1) The taxpayer must be a true agent[; and]
>
> (2) The agent must have no right, title or interest in the money or property received or transferred as an agent.... A contractual relationship whereby one person incurs expense under an agreement to be reimbursed by another is not an agency relationship unless the other elements of agency exists, particularly the element of control....

PMSC had the burden to prove that the reimbursements were not subject to the state's gross income tax. *See Western Adjustment and Inspection Co. v. Gross Income Tax Div.,* 236 Ind. 639, 142 N.E.2d 630, 635 (1957). To do so, PMSC first must demonstrate that it acted as an agent for customers in processing MVRs and second that it received the reimbursements as payment for advances to third parties on behalf of customers.

Our supreme court has adopted the language of the *Restatement of Agency* in defining agency as "the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his *control,* and consent by the other so to act." *UGL III,* 642 N.E.2d 553, 556 (citing *Department of Treasury v. Ice Service, Inc.,* 220 Ind. 64, 41 N.E.2d 201, 203 (1942)) (emphasis in original).[4] Thus, a

---

4. The Department defines agency as "a relationship which results from the manifestation of consent by one person to another authorizing the other to act on his behalf and subject to his complete control, and consent by the other to so act." IND. ADMIN.CODE tit. 45, r. 1– 54 (1988). However, in *UGL III,* 642 N.E.2d at 557–58, this Court struck the adjective "complete" from this regulation. In so doing, the Court observed that the "general law" of Indiana required an agent to be under the control of its principal and reasoned that

party claiming the existence of an agency relationship must prove three elements: "(1) a manifestation of consent by the principal to the agent, (2) an acceptance of the authority by the agent, and (3) control exerted by the principal over the agent." *Johnson v. Blankenship,* 679 N.E.2d 505, 507 (Ind.Ct.App.1997), *summarily aff'd,* 688 N.E.2d 1250 (Ind.1997). The question of whether an agency relationship exists is ordinarily one of fact. *See Woodworth v. Estate of Yunker,* 673 N.E.2d 825, 827 (Ind.Ct.App.1996).

Elements one and two have been met in the present case. PMSC entered into contracts with its customers to retrieve MVRs from government agencies across the United States. Joint Exhibits P through S are sample processing agreements entered into between PMSC and various customers during the tax years 1986–1988. In these agreements, PMSC assumed the duty of processing customers' MVR requests, including "logging, tracking, status and billing information." (Joint Exs. P–S, 3.1.) Representatives from both PMSC and its customers signed the processing agreements: these signatures represented the consent of individual customers to PMSC's agency status and PMSC's acceptance of the agency relationship. *See United Artists Theatre v. Indiana Dep't of State Revenue, Gross Income Tax Div.,* 459 N.E.2d 754, 759 (Ind.Ct.App.1984) (finding no agency relationship existed where "[t]here· was no showing of a manifestation of consent by the parties that [taxpayer] acted on behalf of [purported principals]"), *trans. denied.*

▬ Whether the customer-principal exerted sufficient control over PMSC, the purported agent, to create an agency relationship is in dispute. A principal need merely have the right to control the alleged agent; it does not have to actually exercise control over the agent's activities. *See Gibbs v. Miller,* 152 Ind.App. 326, 283

N.E.2d 592, 595 (1972). The principal's control need not be complete. *See UGL III,* 642 N.E.2d at 557–58. However, the principal's control cannot simply consist of the right to dictate the accomplishment of a desired result. See IND. ADMIN. Code tit. 45, r. 1–1–54 (1988).

The Indiana Court of Appeals addressed the issue of a taxpayer's alleged agency status in *Indiana Department of Revenue v. Waterfiled [sic] Mortgage Comp.,* 400 N.E.2d 212 (Ind.Ct.App.1980) (hereinafter *Waterfield* ), *trans. denied.* The taxpayer in *Waterfield* sought a refund of certain gross income taxes it had paid. The taxpayer was engaged in the mortgage banking business, originating loans with the intent of selling them to permanent investors. A bank initially advanced funds for the loans to the taxpayer, who in turn assigned the mortgage to the bank. For a fee, the taxpayer continued to service the mortgages. The taxpayer's duties in servicing the loans included collecting mortgage payments and transferring them, along with the interest portions thereof, to the appropriate bank. Taxpayer deposited mortgagors' checks into a custodial account and wrote each bank a separate check for the total amount due at the end of each billing period.

On appeal, the State claimed in part that the interest portions of the mortgage payments collected on behalf of the banks constituted gross income to the taxpayer. The Court of Appeals disagreed, making the following observations. First, the contracts between the individual banks and the taxpayer professed to establish an agency relationship. *See id.* at 214. Second, the contracts permitted the banks to control the taxpayer's collection procedures, although the banks had not exercised such control. *See id.* According to the Court of Appeals, the trial court could have reasonably concluded that the banks' failure to exercise control was merely "an

the adjective "complete" improperly added an element to the test for agency. *See id.* at

557.

indication of their satisfaction with the procedures used and results obtained by [the taxpayer]." *Id.* Third, the taxpayer's method of payment, i.e., sending one monthly check rather than remitting the mortgagors' checks directly to each bank, was not inconsistent with an agency finding. *See id.* The Court of Appeals reasoned that the taxpayer received sixty thousand checks each month from mortgagors, so "it would be virtually impossible to remit the payments directly to the banks." *Id.* Further, taxpayer was responsible for following up on dishonored checks; thus, it would have been inefficient for mortgagors to have remitted payments directly to banks and then have had the banks return dishonored checks to the taxpayer for further proceedings. *See id.* Finally, the Court of Appeals noted that the entire amount received from the mortgagors was subsequently transmitted to the banks, which reported the interest portion received as gross income. *See id.*

In the present case, some processing agreements called on PMSC to process the MVR requests within certain time periods. (Joint Ex. P.) At trial, PMSC vice president Harry Lamar Miles (Miles) testified that PMSC was required to send MVRs back to the requesting insurance companies; PMSC had no independent authority to use the MVRs in any other manner. (Trial Tr. at 47.) Furthermore, according to Miles, PMSC could have retrieved the MVR information from sources other than its processing system but could not have pursued alternative sources "without contractual changes." (Trial Tr. at 48.) Miles also indicated that PMSC was obligated to provide its customers with MVRs in the format specified by individual customers. (Trial Tr. at 48.) In addition, Miles stated that customers directed PMSC to the locations where the MRVs would be retrieved and delivered. (Trial Tr. at 49.)

Waterfield is instructive in resolving the present case. In *Waterfield,* the Court of Appeals examined the relevant contract terms and the parties' actions in reaching the conclusion that an agency relationship existed. Unlike with the contracts used by the taxpayer in *Waterfield,* PMSC's contracts did not expressly designate it as the agent for its customers. The presence or absence of specific contract language, however, is not controlling. As the *Waterfield* court recognized, it could look "beyond the mere verbiage of the contracts to ascertain the true nature of [taxpayer's] relationship with the banks." *Waterfield,* 400 N.E.2d at 214; *see also Dutton v. International Harvester Co.,* 504 N.E.2d 313, 317 n.2 (Ind.Ct.App.1987) ("We note the mere express denial of the existence of an agency relationship is not in itself determinative of the matter. The true test in such a situation is how much control the principal has over the alleged agent and the intent and functioning of the parties.") (citations omitted).

The contract under scrutiny in *Waterfield* provided that the banks "may at any time notify the mortgagor to make payment directly to Bank or its agent...." *Waterfield,* 400 N.E.2d at 214. The Court of Appeals focused on the banks' right to control. Similarly, PMSC's customers had a right to dictate various aspects of the retrieval process, such as: (1) location of the records to be retrieved; (2) end destination of the records; (3) format of records to be transmitted; and (4) in some case, the length of time in which to retrieve and transmit records. PMSC lacked any flexibility to control the disposition of the MVRs once they were retrieved. Moreover, PMSC could only retrieve the requested information with its own system, unless customers agreed to an alternate method. The degree to which customers of PMSC exercised these rights is of little significance; that they had the power to exercise these rights matters a great deal.[5]

---

**5.** For as stated by Judge Learned Hand in an unrelated and irrelevant case, "the power and

its exercise must needs coalesce." *United*

■ Efficiency plays a part in both the *Waterfield* opinion and in the Court's present decision. The Court of Appeals in *Waterfield* realized that it would be inefficient for the taxpayer to transmit sixty thousand direct mortgage payments to the appropriate banks as the payments were received. *Id.* Likewise, it would be inefficient for PMSC to require its customers to pay state agencies directly for MVR requests. From 1986 to 1988, PMSC processed approximately one million MVR requests each month nationwide. (Trial Tr. at 27.) During this time, PMSC served around eight thousand customers. *See id.* at 37. One may reasonably assume that if PMSC's numerous customers had possessed the capability to directly pay for the large volume of MVRs at the time a request was made and to so efficiently, then they would have had little need to incur additional charges by engaging PMSC to further retrieve and transmit the information. It seems that PMSC advanced customers the cost of agency assessments as a convenience. PMSC then separately billed these assessments to customers. It made no profits from these transfers.[6] The Court realizes that the "gross income tax is applicable regardless of any profit being involved." *UGL I,* 609 N.E.2d at 53. However, the lack of a profit, when considered together with the efficiency promoted by PMSC's fee arrangement with customers and its billing methods, supports the Petitioner's claim that it was acting as an agent when retrieving requested MVRs for customers.

■ Considering the actual terms of the processing agreements being reviewed and the conduct of PMSC and its customers, the Court concludes that PMSC acted as the agent for its customers, as regards processing of the MVR requests.[7] Having determined this, the Court next must consider whether the reimbursements were truly advances by PMSC to third parties on behalf of its customers. The Department in its Letters of Findings concluded that the reimbursements of agency assessments were in fact "pass throughs" of income. (Joint Exs. M, N.) In reaching its decision, the Department quoted the following language from a 1991 processing agreement: "PMSC shall invoice CUSTOMER for any fees levied and paid by PMSC to any state for porviding [sic] MVR information to PMSC or its subsidiaries concerning an MVR request by CUSTOMER ('State Charges')." (Joint Exs. M, N.) The Department indicated that similar language was found in a contract effective September 30, 1988. (Joint Exs. M, N.)

A review of Joint Exhibits P through S indicates that each contract had language similar to that referenced in the Department's Letters of Findings. For example, Paragraph 6.5 of Joint Exhibit R, a processing agreement between PMSC and Meridian North Insurance Company (an Indiana based insurer), reads: "Customer shall pay PMSC any fees levied and paid by PMSC to any state for providing MVR information on an MVR requested pursuant to this Agreement ('State Charges'), which State Charges shall be invoiced monthly by PMSC." The Court agrees with the Department's reasoning that the plain language of the contracts indicates

---

*States v. Aluminum Co. of Am.,* 148 F.2d 416, 428 (2d Cir.1945).

**6.** During the time period in question, state government agencies assessed an average charge of three dollars per MVR requests. (Trial Tr. at 37, 42–44.) (describing monthly billing process); *see also* Joint Ex. T (sample monthly invoice separately listing state agency assessments and PMSC's service fee charges).

**7.** PMSC was authorized only to retrieve MVRs for customers and to do so in a specific manner. Although not an issue in the present case, the Court notes that PMSC likely served as a "special agent" for its customers. "A special agent is one authorized to do one or more specific acts but not to conduct business generally for the principal." *Koval v. Simon Telelect, Inc.,* 693 N.E.2d 1299, 1304 (Ind. 1998) (answering certified questions posed in 979 F.Supp. 1222 (N.D.Ind.1997)).

that the reimbursements represented "pass throughs" of income. The conduct of PMSC and its customers, as discussed above, also indicates that the parties treated the reimbursements as "pass throughs" of income. The payments were reimbursements for PMSC's advances to various government agencies and not for PMSC's own operating expenses. *But see UGL III*, 642 N.E.2d at 558 (finding no "pass though" of income where reimbursements to corporations were "for those corporations' own expenses, . . . not for monies advanced to third parties"). PMSC lacked a beneficial interest in the reimbursements. Therefore, the Court concludes that PMSC has carried its burden to show that its income from agency reimbursements was not subject to the state's gross income tax.[8]

## CONCLUSION

Based upon the above analysis, the Court hereby REVERSES the Department's determinations that PMSC's income from customers' reimbursements for advances to third parties on behalf of the customers were subject to Indiana's gross income tax. The cause of action is REMANDED to the Department with instructions to sustain PMSC's protest on this issue.[9]

---

**8.** Because the Court finds that an agency relationship existed between PMSC and its customers, the Court need not address PMSC's argument that the reimbursements were nontaxable pursuant to IND.CODE ANN. § 6–2.1–1–2(c)(1) (West 1989), which excludes from gross income "the receipt or repayment of borrowed money."

**9.** PMSC's brief states that its two final arguments "are made only should Argument I [i.e., reimbursements were not subject to

gross income tax] be rejected." · (Pet'r Br. at 15 n.4.) PMSC's remaining two arguments challenged whether the Department erroneously included certain income of PMSC from service fees and reimbursements as taxable gross income, in violation of IND.ANN.CODE § 6–2.1–2–2(a)(2) (West 1989) as well as the Commerce Clause of the United States Constitution, *see* U.S. CONST. art. I, § 8, cl. 3. Having ruled in favor of PMSC as to its first argument, the Court finds that PMSC has waived its remaining arguments.