## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Aug 21 2015, 9:13 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Timothy F. Devereux
Ladendorf Law
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Katherine J. Noel
Justin K. Clouser
Noel Law
Kokomo, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Floyd Kinslow,

*Appellant-Plaintiff,*

v.

Dennis Coddington, Travis Sheets and Gina Sheets,

*Appellees-Defendants.*

August 21, 2015

Court of Appeals Case No.
12A02-1502-CT-106

Appeal from the Clinton Superior Court.
The Honorable Justin H. Hunter, Judge.
Cause No. 12D01-1301-CT-43

**Barteau, Senior Judge**

## Statement of the Case

[1] Floyd Kinslow appeals from the trial court's order granting summary judgment in favor of Travis and Gina Sheets and denying his motion for partial summary

judgment in an action seeking damages for personal injuries he suffered. We affirm.

## Issue

We restate the sole issue Kinslow raises on appeal as follows: whether the trial court erred by granting summary judgment in favor of the Sheetses and by denying Kinslow's motion for partial summary judgment resolving the issue of their vicarious liability for Coddington's alleged negligence.

## Facts and Procedural History

Travis and Gina Sheets own rental properties in Frankfort, Indiana. One of those rental properties was located at 606 Alhambra Street. Although the house faced Alhambra Street, the driveway was accessible by way of Hackett Street, which ran behind the house.

Dennis Coddington, a handyman who did some work for the Sheetses, was at the property on 606 Alhambra on March 19, 2012. After repairing an electrical plug, collecting the rent check from the tenant, and writing a receipt for the rent, Coddington entered his Ford F150 pickup truck and began to back out of the driveway at approximately 9:39 a.m. He stopped his truck after hearing someone yell. Coddington exited his truck and ran toward the road to see what had happened. Floyd Kinslow was lying in the grass on the other side of Hackett Street holding his leg, and the motorcycle he had been riding was also in the grass on the other side of the road.

Kinslow filed a complaint for damages against Coddington alleging negligence claims and made an underinsured motorist insurance claim against GEICO. In his complaint, Kinslow alleged that Coddington's truck had pulled into the path of Kinslow's motorcycle, Kinslow was unable to avoid the collision, and Coddington's truck struck Kinslow's motorcycle resulting in injuries to Kinslow's ankle. On April 5, 2013, the trial court entered an order dismissing Kinslow's underinsurance claims against GEICO pursuant to a stipulation of dismissal without prejudice. On December 6, 2013, Kinslow filed a notice of filing of an amended complaint for damages pursuant to Indiana Trial Rule 15(A). In his amended complaint filed that same day, Kinslow added the Sheetses as defendants to the action. After the Sheetses filed their answer to the complaint, they filed a motion for summary judgment and designation of evidence. In addition to a response to the Sheetses' motion for summary judgment, Kinslow filed a motion for partial summary judgment.

The trial court held a hearing on the parties' motions for summary judgment. On February 2, 2015, the trial court entered its order granting the Sheetses' motion for summary judgment and denying Kinslow's motion for partial summary judgment. Kinslow now appeals.

# Discussion and Decision

## Standard of Review

We review an order on summary judgment de novo applying the same standard as that used by the trial court. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind.

2014). We draw all reasonable inferences in favor of the non-moving parties and will find that summary judgment is appropriate if the designated evidentiary matter shows that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.* A fact is considered to be material if its resolution would affect the outcome of the case. *Id.* An issue is considered to be genuine if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences. *Id.*

[8] The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of fact as to a determinative issue. *Id.* Once that burden is met, the burden shifts to the non-movant to come forward with contrary evidence showing an issue for the trier of fact. *Id.* The non-moving party has the burden on appeal of persuading us that the grant of summary judgment was erroneous. *Id.* However, on review, we carefully assess the trial court's decision to ensure that the non-moving party was not improperly denied his or her day in court. *Id.* In addition, the fact that both parties have filed cross-motions for summary judgment does not alter our standard of review. *Sargent v. State*, 27 N.E.3d 729, 732 (Ind. 2015). We consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law. *Id.*

# Coddington's Relationship To The Sheetses

[9] The designated evidence presented to the trial court reflects that as of the time of his deposition, Coddington had provided handyman services for twelve years for Nina Rogers. Rogers owned several rental properties and according to Coddington operated her business as Rogers Rentals. Although Coddington did not provide his services under a formal business structure, he had business cards bearing the name Rogers Rentals and including Coddington's name and contact information at the bottom. Coddington continued to provide services for Rogers after he began providing handyman services for the Sheetses and would pass out the business cards to the Sheetses' tenants.

[10] Travis Sheets asked other landlords for whom Coddington had done some work about his qualifications and the manner in which he conducted business with them. When Coddington began providing services for the Sheetses, he charged $15.00 per hour and his rate remained the same throughout. There was no formal written agreement between Coddington and the Sheetses. They considered him to be an independent contractor and he considered himself to be a handyman. Additionally, no money was withheld from Coddington's pay. The only year for which the Sheetses issued a 1099 to Coddington was at the end of 2013, well after the accident. Until they were named in the lawsuit, it had not occurred to them to issue a 1099 to those who provided services for them. However, Coddington was never issued a W2 tax form by the Sheetses.

[11] Coddington would discuss the particular repair or task with Travis or Gina, would keep track of the hours he spent doing the task, and would submit a

handwritten invoice, titled Coddington Handyman Service, to them at the end of the month detailing the properties at which he worked and the time and tasks that were involved. The Sheetses would then issue a check to Coddington. They might need to use Coddington's services for several months in a row, or there would be periods of several months when they would not need his services.

[12] Coddington, who provided mostly general contracting work, provided his own tools and truck. If Coddington was too busy to complete the task himself, he would hire people to complete the work for him, if he chose to accept the task. In particular, Coddington hired a crew to paint one of the Sheetses' rental units. When Travis stopped at that location, he was surprised to find people there he did not know, as he unaware that Coddington had hired others to complete the task he had accepted. Coddington, who was paid by Travis and Gina, paid those workers. When Coddington needed to purchase an item for a repair, he would either telephone Travis to arrange for payment with the store, receive a check from Gina in advance for the purchase, or submit a receipt for reimbursement for the purchase if he paid for the item himself.

[13] Travis or Gina would receive calls from tenants about needed repairs or Coddington would receive the calls directly. In either circumstance, Travis and Coddington would discuss the nature of the requested repair and Coddington's availability. Coddington could choose to accept or decline any of the tasks offered to him. If Coddington was already at a particular rental property to mow the grass or collect rent and a tenant approached him about a needed

repair, he would take a look at the issue, inform Travis of the nature of the repair and his estimate of how much the repair would cost, and tell him if it was a task Coddington could undertake. Sometimes Coddington would make the repair on the spot, while other times he would purchase items and return to the property.

[14] If the Sheetses needed larger projects to be completed such as painting an entire house, having plaster work done, or having all of the carpets in a home cleaned, Travis would form a budget for the project to be done by any one of the handymen they used. Travis maintained a list of handymen to turn to for estimates for many kinds of repairs. Oftentimes, for minor repairs, Travis would suggest that certain smaller requested repairs wait until the activity could be combined with another task associated with the property in order to keep the overall cost per hour down. The Sheetses authorized Coddington to repair items as their budget would allow.

[15] One of the services Coddington provided involved the collection of rent. Travis had learned that Coddington provided that service for other landlords. Coddington started doing this for the Sheetses at his usual hourly rate when the Sheetses learned that they would be returning to Liberia. He would collect rent, issue a receipt, and would sometimes deposit the money for Travis and Gina. Coddington was one of the few handymen who was willing to take on that task and was paid for his time only.

[16] Travis Sheets frequently traveled out of the country related to his mission work. He gave Coddington keys to many if not all of the rental properties. Travis notified the tenants that he would be traveling out of the country and would have them contact Coddington if something happened late at night and would have them follow up with a call to Gina the next day. Coddington returned the keys to Travis when asked to do so.

[17] Coddington was collecting the rent for the Sheetses, who were out of the country, when the collision with Kinslow occurred. On the date of the accident, Coddington planned to stop by rental properties on behalf of Rogers and the Sheetses. During his deposition, Coddington at first indicated that he was at the Alhambra address to complete work for Rogers, but then stated that it was one of the Sheetses' properties and that he had to do something for Rogers after that. Coddington did not notify Travis or Gina of the incident. They learned that an accident had occurred only after receiving the amended complaint naming them as additional defendants to the action.

[18] Coddington stopped providing handyman services for the Sheetses late in 2013. They were going to be moving to Liberia to complete missionary work there. A friend of theirs offered to provide services for them for free as the Sheetses transitioned toward moving to Liberia.

## Agency Relationship

[19] Kinslow argues that the trial court erred by concluding that there was no genuine issue of material fact that Coddington was acting as an agent of the

Sheetses at the time of the accident. "Agency is a relationship resulting from the manifestation of consent by one party to another that the latter will act as an agent for the former." *Demming v. Underwood*, 943 N.E.2d 878, 884 (Ind. Ct. App. 2011), *trans. denied* (citing *Meridian Sec. Ins. Co. v. Hoffman Adjustment Co.*, 933 N.E.2d 7, 12 (Ind. Ct. App. 2010)). In order to establish the existence of an actual agency relationship, three elements must be shown: (1) manifestation of consent by the principal; (2) the agent's acceptance of authority; and (3) control exerted by the principal over the agent. *Id.* The elements may be proven by way of circumstantial evidence. *Id.* There is no requirement that the agent's authority to act be reduced to writing. *Id.* Whether the agency relationship exists is generally a question of fact; however, if the evidence is undisputed, the matter may be resolved by summary judgment. *Id.*

[20] Here, Kinslow focusses on the degree of control he claims the Sheetses exerted over Coddington. He does so to support his contention that vicarious liability for Coddington's alleged negligence should be imposed. With respect to control, "'[t]he principal's control cannot simply consist of the right to dictate the accomplishment of a desired result.'" *Id.* at 885 (quoting *Policy Mgmt. Sys. Corp. v. Ind. Dep't of State Revenue*, 720 N.E.2d 20, 24 (Ind. Tax Ct. 1999), *trans. denied*). In order to satisfy the control element, "'[i]t is necessary that the agent be subject to the control of the principal with respect to the details of the work.'" *Id.* (quoting *Turner v. Bd. of Aviation Comm'rs*, 743 N.E.2d 1153, 1163 (Ind. Ct. App. 2001), *trans. denied*). "However, the principal need not exercise

complete control over every aspect of the agent's activities within the scope of the agency." *Id.*

[21]    The designated materials established that the Sheetses would use various handymen or services in the course of the management of their rental properties. Coddington was one of the handymen they would contact to provide an estimate of the cost of the needed repair or task. Coddington provided written invoices, bearing the name Coddington Handyman Services, to the Sheetses in the months he was hired. Coddington, like any other handyman, could choose not to take on work offered by the Sheetses.

[22]    Further, with respect to at least one painting job Coddington undertook for them, he hired and paid his own crew to complete the task. Travis Sheets stopped by the property and was surprised to find people he did not know performing the task. Coddington occasionally collected rent from the Sheetses' tenants, and on occasion would show a property to a prospective tenant. However, Coddington was paid at his hourly rate for the time it took to complete these tasks. To the extent that Travis Sheets controlled which repairs were completed, he did so to control his budget.

[23]    Based on the foregoing designated evidence we conclude that the trial court did not err by granting the Sheetses' motion for summary judgment and denying Kinslow's motion for partial summary judgment with respect to this common law agency argument.

# Independent Contractor or Employee

[24] Kinslow also argues that the trial court erred by concluding as a matter of law that Coddington was an independent contractor and not an employee. "[T]he question of whether one acts as an agent or independent contractor is generally one of fact." *Benante v. United Pacific Life Ins. Co.*, 659 N.E.2d 545, 548 (Ind. 1995). Additionally, "[t]hat the parties may have characterized their relationship as that of independent contractor is significant but not dispositive." *Id.*

[25] When evaluating whether one's status is an employee or an independent contractor in many contexts in addition to negligence cases, we have applied the ten-factor test from the Restatement (Second) of Agency § 220 (1958). *See e.g., Howard v. U.S. Signcrafters*, 811 N.E.2d 479 (Ind. Ct. App. 2004) (applying test in worker's compensation case).

[26] Coddington had his own informal business, Coddington's Handyman Service, and worked for others, including Rogers and the Sheetses, submitting his own invoices to them. The Sheetses issued a check to Coddington when they received an invoice from him. He was not paid a salary and did not receive a W2 tax form from the Sheetses. Coddington believed that he was a handyman, and the Sheetses believed that he was an independent contractor. The only year for which the Sheetses issued a 1099 to Coddington was at the end of 2013. Until they were named in the lawsuit, it had not occurred to them to issue a 1099 to those who provided services for them. No money was withheld from the checks issued to Coddington.

[27] Coddington supplied his own truck, his own tools, and hired a crew when needed to complete a task he had accepted. Coddington provided certain handyman services that were general in nature, while the Sheetses managed rental properties they owned. The fact that the Sheetses sometimes had Coddington collect rent payments from the tenants and that it was also a task that the Sheetses did in the course of managing their properties does not weigh in favor of employee status. Coddington did so by his own choice at his hourly rate when hired by the Sheetses while they were out of the country. Coddington did not report the accident to the Sheetses; rather, they learned of the incident upon receiving the amended complaint naming them as defendants.

[28] We have already discussed the extent-of-control factor in the argument above concluding that no agency relationship existed. The same rationale supports the conclusion that Coddington was an independent contractor and not an employee.

[29] The designated evidence pertaining to these ten factors supports the trial court's conclusion. The trial court did not err by concluding that Coddington was an independent contractor and not an employee.

# Conclusion

[30] In light of the foregoing, we affirm the trial court's order granting summary judgment in favor of the Sheetses and denying Kinslow's motion for partial summary judgment.

Affirmed.

Mathias, J., and Bradford, J., concur.